Mitchell *v.* Worden.

## MITCHELL and others *vs.* WORDEN.

The law does not, in ordinary cases, impose upon a purchaser of property the duty of disclosing to the seller, at or before the sale, the state of his pecuniary circumstances, however desperate they may be, and be known by him to be.

This general principle is applicable, notwithstanding there has been a long course of dealing between the parties, in the course of which credit has been given to the purchaser, and he has punctually performed his engagements; and his insolvency has occurred during those dealings.

No relation of trust or confidence is thereby created, which should entitle the seller to expect of the purchaser, or require of the purchaser, as a legal duty, to communicate to the seller information of his inability to pay all his debts, while he continues his business and the management of his affairs.

Therefore, although a purchaser, at the time of making an additional purchase from persons with whom he has been in the habit of dealing, is insolvent, and he well knows his insolvency, and intentionally conceals it from the vendors, by simply withholding his knowledge on the subject, without otherwise saying or doing any thing to mislead, and he still retains the possession of property, and is pursuing his business as before, he is not thereby guilty of a fraud, entitling the vendor to avoid the sale.

But if the purchaser, at the time of making a new purchase, is not only insolvent, and knows himself to be so, but has performed an open and notorious act of insolvency, by breaking up his business and assigning his property for the benefit of his creditors, it is his duty, arising out of his previous dealing with the vendors, to communicate that fact to them, before the sale; and the violation of that duty amounts to a fraud.

A person receiving the property thus obtained, from the purchaser, without paying any thing on account of it, and with notice of facts which render him legally chargeable with knowledge of the fraud, will not be considered a *bona fide* purchaser.

MOTION by the plaintiffs for a new trial, upon a case. The complaint alleged that the plaintiffs were partners, doing business as merchants, at Philadelphia; that on the 17th of November, 1853, Edward W. McCabe, a liquor merchant at Auburn, sent an order to the plaintiffs, by mail, directing them to send to him a cask of old pale brandy, of 78 gallons, and a cask of gin; and that on the 23d of November he also ordered six baskets of champagne wine; that on the 2d of December, 1853, the plaintiffs shipped and sent to the said McCabe the brandy and wine so ordered, which were of the value of about $400; that the said brandy and wine were shipped and sent by the usual and ordinary mode of conveyance, and reached the depot and store house of the New York Central Rail Road at Auburn, on or about the middle of December, and the same remained and continued until about the 26th day of that month in the possession and custody of the said rail road company, at said depot, as a middle man between said McCabe and the plaintiffs. The complaint further alleged that at the date of the said McCabe's first order, and prior thereto, he the said McCabe was in straitened and failing circumstances, and insolvent, to the knowledge of said McCabe and the defendant in this action; and at the date of the said second order, he, the said McCabe had, to the knowledge of the defendant, made and transferred to certain assignees his property, for the benefit of his creditors, and was insolvent, to the knowledge of said McCabe and the defendant; and that McCabe concealed said insolvency from the plaintiffs, with intent to defraud them. That at the date of said first order, and prior thereto, and all the time subsequent thereto, up to and until about the 28th day of December, 1853, the plaintiffs were entirely ignorant of the said straitened, and failing, and insolvent circumstances of the said McCabe, and of said assignment by him, and believed him to be in good circumstances, and to be dealing and doing business in good faith, and the said brandy and champagne were shipped and sent to said McCabe by the plaintiffs, in conformity to said orders, in entire good faith, and solely because of their entire reliance upon the supposed good faith of said McCabe, and

their belief in the goodness and sufficiency of the pecuniary and business circumstances and solvency of the said McCabe; and upon an indefinite and uncertain credit therefor. That on or about the 26th day of December, 1853, the defendant, being advised and cognizant of the straitened, failing, and insolvent circumstances of the said McCabe, and of the assignment theretofore made by said McCabe, of his property for the benefit of certain of his creditors, and being advised and cognizant of the absolute refusal which had been theretofore made by said rail road company to deliver up or surrender said brandy and champagne to said McCabe, because of his known insolvency and assignment, and being advised and cognizant of the absolute refusal which had been theretofore made by the assignee of said McCabe, under said assignment, to take or receive said brandy and champagne, from said rail road company, as a part or portion of said assigned property of McCabe, and being advised and cognizant of the non-payment, and existing indebtedness of said McCabe for said goods, and the inability of said McCabe to pay them for the same, and of the same being in the possession and custody of said rail road company, as a middle man between the said plaintiffs and said McCabe, or his said assignee, did wrongfully and fraudulently remove said brandy and champagne from the premises of said rail road company, against their will, and with intent to defeat the right of stoppage in transitu of said property by said plaintiffs, and thereupon concealed and secreted the same from the plaintiffs, and upon a demand which was made upon the defendant, of said property, by the plaintiffs, on the 29th day of December, 1853, and immediately on the discovery of the premises aforesaid, and before suit, the defendant wrongfully and fraudulently refused to surrender or yield up the same to the plaintiff, to their damage $400, and interest from December 29, 1853. The same cause of action was set out, in similar form, in other counts.

The defendant, by his answer, denied each and every allegation contained in the complaint. He also denied that the right, title and property in the said brandy and wine were in the plaintiffs, or in any stranger or third person.

On the trial McCabe was examined as a witness for the plaintiffs, and proved the signing and sending of the orders to the plaintiffs, by him. He further testified: "I afterwards saw the property ordered, in the store house at the depot in Auburn, or I was told it was there; the order, which is not dated, (the first one,) was sent on the 7th day of November, 1853; the goods were worth over $375; the brandy was worth from $4 to $4.10 per gallon, and the casks contained about 80 gallons; the gin I took and used and left the brandy in the car house; there were six baskets of champagne, worth from $14 to $18 per basket; I have been in the habit always of leaving my articles in the car house until I wanted them and then I took them away. The order dated November 23, 1853, was the last order I made upon the plaintiffs; the goods so ordered by me were not paid for; they were obtained on credit; our understanding was six months. On the 21st day of November, 1853, I made a general assignment of my property for the benefit of creditors; I did not at the time of, or prior to the time of sending either of the orders for goods to the plaintiffs, communicate to the plaintiffs the condition of my pecuniary affairs, or that I had made an assignment. I think one of the plaintiffs told me on the 8th of December, that he saw the fact of my assignment advertised. The brandy came on the 8th day and the wine came on the 9th day of December, 1853." On his cross-examination the witness said: "I had not any idea, when the first order was sent, of making an assignment of my property."

It was proved that the goods arrived at the depot about the 9th or 10th of December, 1853, and remained there until the 26th of that month, when they were delivered to a carman by the name of Austin, who had been McCabe's cartman and was in the habit of taking his goods away.

Margaret J. McCabe was then called by the plaintiffs and testified: "I was at home in Auburn in December, 1853; I know the defendant Worden; I had a conversation with the defendant during the month of December last, at my house, relative to the goods then at the rail road depot; the conversation was about my selling the goods to him; I wanted to do

so; I made an arrangement with the defendant and he was to take the goods; I sold him the goods; I sent Austin the cartman to the depot to get the goods and take them to the defendant's; Mr. Worden afterwards told me he had received the goods; Mr. Worden did not pay me for the goods; there were no particular terms of sale; Mr. McCabe was then indebted to Mr. Worden; Mr. Worden was to take up some notes at the bank given by Mr. McCabe; the transfer by me of the goods was made on account of Mr. McCabe's indebtedness to Mr. Worden; think I have a faint recollection of something said about $500, something said about notes; cannot tell exact amount of McCabe's indebtedness to Worden; I told the defendant that John E. Beardsley said defendant was not protected in McCabe's assignment, and he had rather the defendant would have the goods than any one else, and that somebody would have them if the defendant did not have them, and also something said about keeping the defendant still in regard to the assignment; the defendant said he did not want to have any thing to do with the goods; I gave an Irishman the money to pay the freight on the goods; the defendant knew I was going to pay the freight; the goods were part champagne; the defendant told me there were baskets of champagne there; Mr. McCabe was in Rochester at the time of this conversation; the defendant has not at any time since, paid me for the goods." Edward W. McCabe was then recalled by the plaintiffs and testified: "There were two notes of mine indorsed by the defendant which lay in Auburn bank; both notes were due at the time of the assignment made by me; I have not paid Worden in any other way than by turning out this property; notes were both signed by McCabe and indorsed by the defendant; one note was for $225, the other for $200; one was payable in four months, the other in three months."

The plaintiff then proved a demand of the goods, of the defendant, before the commencement of the suit, and a neglect or refusal to deliver.

The defendant's counsel moved the court to nonsuit the plaintiffs on the grounds, (1.) That on the 2d day of December,

1853, when the plaintiffs shipped the brandy and wine from Philadelphia to McCabe at Auburn, the delivery was absolute and unqualified, and the title in and to the same then passed to McCabe. (2.) That the brandy and wine having arrived at the depot in Auburn, was subject to McCabe's order, and the right to stop the same *in transitu* was at an end, and the plaintiffs had shown no property in the goods. (3.) That the fact, if true, that McCabe was insolvent when he ordered the goods, was not evidence of fraud. That there was not sufficient evidence to sustain the action. After argument by the respective counsel, his honor, the judge, granted the motion and nonsuited the plaintiffs. To which decision the counsel for the plaintiffs excepted. And the plaintiffs except to said decision on the grounds, (1.) That the evidence entitled the plaintiffs to a verdict. (2.) That when the plaintiffs demanded the goods of the defendant, the right of stoppage *in transitu* was in force. (3.) That there was sufficient evidence of fraud to go to the jury. (4.) McCabe's title to the goods had passed to his assignees before the transfer to the defendant, and prima facia the evidence entitled the plaintiffs to a verdict against the defendant. (5.) The transfer by Mrs. McCabe of the goods to the defendant was invalid against the plaintiffs. (6.) The bona fides, sufficiency of consideration and notice, were questions that affected the defendant's purchase, and should have been left to the jury.

*Geo. Rathbun*, for the plaintiffs.

*John Porter*, for the defendant.

*By the Court*, T. R. STRONG, J. The basis of this action is, that the sales of the property in question by the plaintiffs to McCabe, were obtained by the latter by a fraudulent concealment from the plaintiffs of important facts in regard to his pecuniary circumstances, which it was his duty to disclose to them, wherefore the sales were void; that the defendant is not a bona fide purchaser from McCabe; and that he wrongfully withholds and has converted the property.

Mitchell *v.* Worden.

In relation to the brandy, a portion of the property, I am satisfied the evidence falls entirely short of sustaining the action. The order for the brandy was forwarded to the plaintiffs some days before McCabe made an assignment ; he did not then, as he testified, contemplate making an assignment; it does not appear that he was then insolvent, or that he understood he was so, except as it may be inferred from the mere fact that he soon after made a general assignment for the benefit of his creditors, without any proof of the extent of his inability to pay his debts ; there is no evidence of an intention on his part not to pay for the property, or of any fraudulent intent, in making the purchase ; and for aught that appears, his circumstances were as good at that time as they had been at any time while he had been a customer of the plaintiffs.

But assuming that McCabe was, at the time of the purchase of the brandy, insolvent; that his circumstances had become reduced during the period he was buying of the plaintiffs from time to time on credit, and meeting his engagements as to payments ; and that he well knew his insolvency, and intentionally concealed it from the plaintiffs, by simply withholding his knowledge on the subject, without otherwise saying or doing any thing to mislead ; yet retained the possession of property and was pursuing his business as theretofore—he was not, in my opinion, thereby guilty of a fraud, entitling the plaintiffs to avoid the sale. The law does not, in ordinary cases, impose upon a purchaser of property the duty to disclose to the seller, at or before the sale, the state of his pecuniary circumstances, however desperate they may be, and be known by him to be. Although the knowledge may be of the highest importance to the seller, for the protection of his interests, the duty of communicating it is only a moral duty, belonging to a large class of similar duties denominated by Chancellor Kent, " imperfect obligations which are binding in conscience, but which human laws do not and cannot undertake directly to enforce." (2 *Kent's Com. 4th ed.* 490.) Parties to contracts must themselves exercise reasonable care to guard against loss, and, in general, that degree of care requires the party giving credit to make

inquiries of the party to whom it is given, at least, in regard to his ability to pay. For a fraudulent misrepresentation by the purchaser, of important facts in respect to his circumstances, accompanied with damage, the law affords a remedy; the sale may be avoided; and an action for the fraud, to recover the damages, will lie. The general principle above stated, that the purchaser is under no obligation to disclose to the seller his insolvency, although known to him, is, I think, equally applicable notwithstanding there has been a long course of dealing between the parties, in the course of which credit has been given to the purchaser and he has punctually performed his engagements—his insolvency having occurred during those dealings. No relation of trust or confidence is thereby created, which should entitle the seller to expect of the purchaser, or require of the purchaser, as a legal duty, to communicate to the seller information of his inability to pay all his debts, while he continues his business and the management of his affairs. If there is an obligation to disclose in such a case, where does it commence? at insolvency, or on the way to insolvency, and at what point, and what proof of knowledge is required? An attempt to extend the protection of the law to purchasers, so far as to impose such an obligation, would work much more injustice than it would remedy.

In relation to the sale of the wine, the other portion of the property in question, there is an additional fact to those which exist and are assumed to exist, in respect to the sale of the brandy, which, upon the question of fraud in the sale, is entitled to much consideration. The order for the sale of the wine was not made until two days after the assignment by McCabe, and when of course he was entirely divested of property. Not only was he insolvent, and known by him to be so, but he had then performed an open and notorious act of insolvency. Was it not his duty, arising out of his previous dealings with the plaintiffs, to communicate that fact to them before the sale. The plaintiffs carried on business at Philadelphia, remote from McCabe, whose place of business was the city of Auburn; they had from time to time for the period of five years, made sales

Mitchell *v.* Worden.

to him, and he had paid' them a great deal of money ; their dealings would naturally excite the confidence of the plaintiffs in him, and lead them to expect, at least, that in case of his breaking up his business and assigning his property for the benefit of his creditors, he would on applying to them to make a further purchase, inform them of those facts. I am not prepared to say that to this extent the plaintiffs had not a right to repose confidence in him, and to be protected in so doing by law. I think they had ; and that thus far McCabe was under a legal duty, the violation of which was fraud. Here is a plain, well defined limit for the commencement of a legal obligation— a course of dealing calculated to produce confidence, followed by closing business and giving up the property for creditors. Thus far, legal protection can in practice be afforded to sellers without injustice to purchasers. (*Story's Eq. Jur.* §§ 204, 207. *Bench* v. *Sheldon*, 14 *Barb.* 66, *and cases cited.*)

It cannot be claimed, upon the evidence, that the defendant was a bona fide purchaser. He had notice of facts which render him legally chargeable with knowledge of the fraud ; and besides it does not appear that he paid any thing on account of the property, or that his situation has been in any way changed.

I do not perceive that the doctrine of stoppage *in transitu* has any relation to this case. If the right existed while the property was at the depot in Auburn, it was certainly at an end after the property came into the possession of the defendant.

A new trial must be granted, with costs to abide the event.

[CAYUGA GENERAL TERM, June 4, 1855. *Selden, Johnson* and *T. R. Strong*, Justices.]