NICHOLS *et. al. v.* PINNER and MICHAEL.

The mere omission of a purchaser of goods to disclose his insolvency to the vendor is not a fraud for which the sale may be avoided.

When no inquiries are made of the vendee on the subject, and he makes no false statements nor resorts to any artifice to mislead the vendor, it is not in general fraudulent in him to remain silent in respect to his pecuniary condition.

An honest though abortive purpose to continue business and pay for the goods is consistent with the vendee's knowledge of his own insolvency, and the purchase is not fraudulent when made with such intent, though founded in delusive and unreasonable expectations.

Whether, however, the failure of the purchaser to disclose a marked and sudden change in his affairs for the worse, which he has reason to suppose unknown to the vendor, may not be a fraudulent concealment, rendering the sale voidable, *quere,* per SELDEN, J.

APPEAL from the Supreme Court. The action was for the recovery of the possession of personal property, consisting of goods and merchandise purchased by the defendant Pinner of the plaintiffs, upon the allegation that he purchased the same fraudulently, with the design not to pay for them. The complaint was for the wrongful detention of the property. Upon the trial at the Erie Circuit, before Mr. Justice GREENE and a jury, it was proved that Pinner was a grocery merchant in the city of Buffalo, and had been for several years in the habit of purchasing goods of the plaintiffs, in the city of New York, on credit.

In April, 1853, he purchased, at several times during the month, bills of goods on his usual credit of six months, and in June thereafter, gave his notes for the same at six months, dated at the time of the several purchases. It appeared that these were larger than his usual purchases, Pinner stating that he was about to open a wholesale store in addition to his retail business. It was also proved, under objection, that he purchased of other merchants a larger amount of goods than usual, and that at the time of such purchases he stated that he was doing well and making money, and was going to increase his business; that he had always made money in business and increased his capital every year.

It appeared that Pinner started a wholesale store in the same spring, in addition to his retail store. It did not appear that the plaintiffs were induced to sell upon any representations on the part of Pinner, but upon their confidence in him growing out of past dealings.

On the 23d day of August, 1853, Pinner made an assignment to the defendant Michael for the benefit of his creditors, preferring Michael himself for some $17,000. The plaintiff received, on the thirtieth day of August, from Pinner, intelligence of his failure, and immediately sent his clerk to Buffalo, and he had an interview with Pinner and Michael, who did not give very satisfactory reasons for the failure. It appeared, by the statements of Pinner to this clerk, that if his failure was as bad as he represented, he must have been insolvent at the time of the purchases; and from all the testimony on the part of the plaintiffs, there was a proper question of fact, whether the failure was not a fraudulent one. The plaintiffs proved a demand of the goods from Michael, and the witness thought he offered to return the notes of Pinner to Michael, but he was not certain that he recollected offering to return them. The plaintiffs produced the notes upon the trial, and offered to cancel them.

Upon this testimony, a motion was made for a nonsuit as to each defendant, on the grounds that: 1st. No demand had

been made on Pinner before suit; 2d. No offer was made to return his notes; 3d. Pinner had not possession of the goods, 4th. No fraud had been shown sufficient to avoid the sale. The motion was denied and exceptions taken.

The defendants gave proof tending to show that Pinner's purchases in 1852, of the plaintiffs and others, upon credit, were about as large as in 1853, and that he paid some $10,000 to different individuals at the time of his purchases, in April, 1853, and that he paid, between that time and his failure, some $28,000 more.

The court charged the jury that if they should find that Pinner procured the possession of the goods from the plaintiffs fraudulently, with the preconceived design not to pay for them, the title did not pass from them, and they would have the right to repudiate the sale, and reclaim the goods by restoring whatever had been received on such sale. The defendants requested the judge, among other things, to charge that, if Pinner had delivered the goods to Michael before the commencement of the suit, the plaintiffs could not recover against him. He was also requested to charge that if the jury should find that the only fraud was Pinner's concealing his circumstances at the time of the purchase, such concealment was not fraudulent, because he was not bound to disclose his circumstances. The court refused so to charge, and the defendants excepted. The jury found for the plaintiffs. Upon appeal, the judgment was affirmed at general term in the eighth district, and the defendants appealed to this court.

*John L. Talcott*, for the appellants.

*John Ganson*, for the respondents.

PRATT, J. That the jury would have been warranted, from the whole evidence in this case, in finding that the assignment was made for the purpose of delaying and de-

frauding creditors, may perhaps be conceded. The account which Pinner gave of the causes which led to his failure were not very satisfactory. He seems to have been a close buyer of goods, and to have done a good and safe business. The losses proved would scarcely account for so bad a failure.

But the question whether the purchase of the stock of goods, in the preceding April, from the plaintiffs, was fraudulent, was a very different one. The defendant Pinner had long been a customer of the plaintiffs. He made his purchases at the usual time. No representations were made by him to the plaintiffs, in regard to his condition, tending to mislead them and to induce them to give him a credit which they would otherwise have withheld. Some evidence, it is true, had been given, showing that his purchases were larger that spring than usual; but he explained that at the time, by stating that he designed to open another store and sell by wholesale, which statement is not claimed to have been untrue. So far, therefore, as the evidence discloses, it was the ordinary purchase by a customer with whom the plaintiffs had dealt for several years, and in whom they had the utmost confidence as a merchant and a man of business. The most, therefore, that could be claimed from the evidence, when the plaintiffs rested and the motion for a nonsuit was made, so far as it bears upon facts existing at the time of those purchases in April, is, that Pinner was in fact at the time insolvent, and knew that he was so. The motion, therefore, must have been denied, either upon the assumption that it was a fraud upon the plaintiffs for Pinner (knowing himself insolvent, or rather knowing that he was owing more than his assets were worth) to purchase a bill of goods without disclosing the condition of his affairs to the seller, or that the subsequent failure alone was sufficient evidence from which the jury might infer that the purchase was made with the design to cheat and defraud the plaintiffs out of the goods.

It was not contended, upon the argument, that the fact of known insolvency at the time of the purchase, alone, rendered it incumbent upon Pinner to disclose the fact to the vendors, to escape the imputation of fraud. The authorities, if any were needed, are all the other way. To constitute fraud in such cases, there must be an intention to cheat; at least, there must be intention to do an act, the necessary result of which will be to cheat and defraud another. But it is clear that such intention is not necessarily inferable from the fact that a man in good credit, going on with his regular business, makes his usual purchases for the purpose of continuing that business, after he is made aware that his property is not sufficient to pay his debts. It is not fraudulent in him to make reasonable efforts to retrieve his fortune and to extricate himself from his embarrassment. It is not unnatural that he should cling to the hope that better times would come—that *to-morrow should be as this day and much more abundant;* and that with this hope, however delusive results may have shown it to be, he should have been impelled to buy more goods, contract new debts, and struggle on until some casualty should precipitate the catastrophe upon him, and he find himself in hopeless bankruptcy. This is an every-day experience in the commercial world; and it would be hard, indeed, if the unfortunate victim of hopes that looked to him at the time as reasonable, must, in his misfortunes, be judged by the actual instead of the possible results. The authorities do not sustain any such harsh doctrine, but the reverse. (*Lupin* v. *Marie*, 6 *Wend.*, 77; *Conyers* v. *Ennis*, 2 *Mas.*, 236; *Mitchell* v. *Worden*, 20 *Barb.*, 253; *Smith* v. *Smith, Murphy & Co.*, 21 *Penn.*, 367.)

Upon the question whether the purchase was made with the actual design not to pay for the goods, but to cheat and defraud the plaintiffs out of their value, it is not necessary in this case to examine whether the simple purchase of goods, with the preconceived design not to pay for them,

when there was no artifice or deceit used, is in itself such a fraud as to render the sale void. The important question in this case is, whether there was sufficient evidence of any such intent to be submitted to the jury. I think there was not.

Fraud must be proved affirmatively. The presumption is always in favor of innocence and not of guilt. " *Odiosa et inhonesta non sunt in lege præsumenda.*" The evidence should, therefore, be direct and strong, which would authorize the repudiation of a contract on the ground of fraud; especially in the case of an executed contract of sale, where the goods have been delivered and become mingled with the mass of the purchaser's other property. It should be upon no doubtful testimony, upon no equivocal circumstances, that the vendor in such a case should be allowed to repudiate the sale and reclaim the goods, thus gaining a preference over other creditors equally meritorious.

I have not been able to find that kind of evidence in this case. As I have before suggested, I find nothing in the circumstances attending the purchase of the goods that should be deemed to indicate a fraudulent design not to pay for them — nothing which should be submitted to a jury upon that point. If, therefore, there was any evidence at all which ought to be submitted to establish the allegation of fraud in the purchase, it must be found in the fact of the assignment and the circumstances attending it. The plaintiffs showed that the defendants did not agree in regard to the amount of indebtedness from Pinner to Michael and the consideration for such indebtedness, and that Pinner did not explain in the most satisfactory manner the causes of his failure. This is about all the evidence given tending to cast any suspicion upon the assignment itself. It was all relevant upon the question whether the assignment itself was honest or dishonest — whether it was an honest appropriation by Pinner of his property, for the purpose of paying his debts, or whether it was a device for the purpose of delaying and defrauding creditors. And if there had been

Nichols *v.* Pinner.

an issue in the case involving these questions, there was perhaps evidence enough to submit to a jury upon such issue; but it seems to me they did not alone, unconnected with other circumstances of suspicion at the time, by any natural or necessary inference, bear at all upon the question whether the goods that were bought some four months previously were bought with the fraudulent design of not paying for them. The inferences by which the two transactions are sought to be connected are not natural, but forced. There is no natural inference, because an assignment was made in August, that the party intended, the previous April, to assign. And if we may infer from the fact of insolvency, in August, that Pinner was insolvent in the previous April, and upon this also infer that he knew it, it by no means follows that he knew that he should be unable to continue his business and should be compelled to assign. And if it be assumed that the assignment was fraudulent (and unless that be assumed there is nothing at all in the plaintiffs' case), there is no necessary or natural inference that the fraudulent design was formed some four months previous to carrying it into execution. The natural inference would be that the fraudulent design was formed, if at all, about the time that it received outward expression in the form of an assignment. It should require something more than the fraudulent transaction itself, something pointing to a preconceived design, to authorize the ante-dating such design so long before. There should be some affirmative proof of such anterior fraudulent design on the part of the purchaser, before the vendors should be allowed to thus repudiate the sale and gain a preference over other creditors. And as I have been unable to find any such evidence in the case, I think the learned justice erred in refusing to grant the motion for a nonsuit, and that the defendants' exception was well taken.

I think the court also erred in refusing to charge that the omission of Pinner to disclose his circumstances was not sufficient alone to render the purchase fraudulent.

As the case stood, especially after the defendants had proved that Pinner had paid some $28,000 of debts between April and the time of making the assignment, it was difficult to perceive upon what ground fraud in the purchases could be predicated, unless it was upon the assumption that he was bound to disclose his circumstances. It was perfectly proper, therefore, for the counsel for the defendants to re quire a ruling from the court, one way or the other, upon that proposition, and the judge should have responded to that request.

Other exceptions were taken which were argued; but the conclusion at which we have arrived, upon those already considered, makes it unnecessary to examine them.

' The judgment must be reversed and a new trial granted.

SELDEN, J. The judge charged the jury, in this case, that if the defendant Pinner "procured the possession of the goods *fraudulently*, with the preconceived design of not paying for them," then the title to the goods never passed to Pinner, and the plaintiffs could redeem them, and to this the counsel excepted.

If the term "fraudulently," as here used, is to have its full and unrestricted meaning, the legal soundness of the proposition laid down by the judge cannot be disputed No one will deny that fraud would vitiate and avoid the sale. The only objection to the charge in that aspect is, that in a case which turned upon a somewhat nice inquiry as to what would constitute fraud, the language thus understood would not tend very greatly to enlighten the jury. This, however, is not an objection which is available on exception. The defendants' counsel should have called upon the judge to state, in view of the evidence, what facts would be sufficient to charge the purchaser with fraud. His omission to do so probably arose from his understanding the words, "with the preconceived design of not paying for them," as a specification of the particular fraud which the

judge had in his mind and which the evidence tended to show, and hence interpreting the charge as embracing simply the proposition that such a design would be sufficient to avoid the sale.

If we were at liberty thus to construe the charge, I should regard it as clearly erroneous. The law takes no cognizance of a naked design which is demonstrated by no act. If one *does* only that which is lawful, and violates *in action* no positive duty, his intentions cannot be reached. An intent to overthrow the government is not treason without an overt act. An intent to commit murder or any lesser crime is never punishable, and an intent to commit a fraud is governed by the same rule. The intention may exist at one moment and be changed the next. The party is *in loco penitentiæ* until he does some act in furtherance of the intent. The purchase of goods is a lawful act, and the validity of the purchase cannot be affected by the mere mental state of the purchaser.

But although it seems not unlikely, in view of the testimony given upon the trial, that the judge may have intended to say that the preconceived design not to pay would amount to a fraud, yet this is not the literal meaning of his language; and of two interpretations this court always adopts that which will sustain rather than one which will overthrow a charge. If, therefore, this were the only point in the case, I should not think it presented any error for which the judgment should be reversed.

But the judge was requested, by the counsel for the defendants, to charge that "if the jury should find the only fraud was Pinner's concealing his circumstances at the time of the purchase, that such concealment was not fraudulent, because he was not bound to disclose his circumstances," and the judge having declined so to charge the counsel excepted.

To this exception two answers are given. First, it is said that the proposition was an abstraction, that there was

nothing in the case upon which the request could with propriety be predicated. The case itself, however, does not, I think, sustain this position. The request is to be viewed in connection with that part of the charge already noticed. We have construed the term "fraudulently," used by the judge, as not necessarily limited in its scope by the clause which follows it; and on that ground we overrule the defendants' exception. On looking into the case we find some foundation for the inference that Pinner was insolvent when he made the purchase, and that he must have known it. It was entirely proper, therefore, for the counsel to ask the judge to instruct the jury that that inference alone would not justify them in finding the purchase to have been fraudulent.

Another answer to the exception under consideration is, that the word "concealing," as used in the request, meant something more than a mere omission to disclose; that it implied some act or contrivance on the part of Pinner to *cover up* his insolvency, and that there was evidence in the case tending to show such contrivance. But the sense in which the word "conceal" was intended to be used is shown by the last clause of the request, viz., "because he was not bound to disclose," &c. In the sentence, taken as a whole, concealment stands opposed to the obligation to disclose; and the obvious antithesis must control the interpretation. I understand the request, therefore, as calling upon the judge to instruct the jury that if they should find no other fraud in the case except the mere omission by Pinner to disclose the fact of his insolvency, this would not be sufficient to avoid the sale; thus presenting a point which, it seems to me, might very fairly arise upon the evidence in the case.

In declining to give this instruction to the jury I think the judge erred. It has never, that I am aware of, been held that a purchaser of property is bound, when no questions are put to him in regard to it, to disclose his own pecuniary condition and means of payment. If he makes

no false statement and resorts to no arts or contrivances for the purpose of misleading the vendor, it is not, I think, a fraud to say nothing on the subject. There may be circumstances under which the concealment of a marked and sudden change in the pecuniary affairs of a purchaser, which he had reason to suppose unknown to the vendor, might amount to a fraud, but this does not appear to me to be such a case. To require of a purchaser, as a general rule, that he should volunteer a statement of his pecuniary affairs, if he knows or has reason to suppose himself insolvent, would lead to great embarrassment and inconvenience in the transaction of business and would prove a most fruitful source of unprofitable litigation.

For the error of the judge, in declining to charge as requested upon this point, the judgment should, I think, be reversed, and there should be a new trial, with costs to abide the event.

HARRIS, J. (Dissenting.) That Pinner was insolvent when he purchased the goods in question — so utterly insolvent that it can scarcely be believed he was ignorant of the fact — was incontrovertibly established upon the trial. The amount of his purchases, at the time, was between $35,000 and $40,000. This large amount of goods was purchased upon credit. When, four months afterwards, he came to make his assignment, his entire stock amounted to but $22,000 and the debts due him to $6,600. His preferred debts amounted to $24,000, the greater part of which was due to the defendant Michael, his brother-in-law and assignee. According to his own account of his affairs, he must have been insolvent when he made the purchases in April, 1853, to the amount of $30,000, and the effect of these large purchases was to provide the means for paying the large sum he owed his brother-in-law, and other confidential debts, leaving nothing for the creditors from whom he had obtained the goods. Upon such a state of facts, it

might well be expected that the jury, when called upon to pronounce upon the intent with which the April purchases were made, would declare it to be fraudulent. It would be difficult to reach any other conclusion.

It is not pretended that Pinner, when he obtained the goods in controversy, made any representations, one way or the other, in relation to his pecuniary condition. He was undoubtedly insolvent. He probably knew he was insolvent. But mere insolvency, even though the fact is known and not disclosed, is not sufficient to avoid a sale. The goods might have been purchased with the honest purpose of continuing business and paying for them. If so, however much he might have deceived himself, the plaintiffs could not rescind the sale. The vitiating element would be wanting in such a transaction. But, on the other hand, if the purchase was made with the dishonest purpose of subjecting the goods to the payment of other debts, and thus defrauding the plaintiffs, the sale was voidable, even though the purchaser was able to effect his purpose without resorting to any fraudulent artifice or device. It thus becomes a question of motive. If the goods were obtained for a fraudulent purpose, the sale may be avoided. But if the purchaser acted in good faith, intending no wrong, however much he may have misjudged, the sale cannot be avoided. The motive, whether honest or dishonest, is to be ascertained from the facts and circumstances attending the transaction, and is a question for the jury. "A deduction of fraud," says KENT, "may be made, not only from deceptive assertions and false representations, but from facts, incidents and circumstances, which may be trivial in themselves, but decisive evidence, in the given case, of a fraudulent design." (2 *Kent's Com.*, 484.) And, in *Durell* v. *Haley* (1 *Paige*, 492), Chancellor WALWORTH says: "If a purchaser who is insolvent conceals the fact from the vendor, and thus obtains goods without intending to pay for them, it is a fraud, and the property is not changed in the hands of the

vendee." The same doctrine is asserted in *Ash* v. *Putnam* (1 *Hill*, 302), *The Earl of Bristol* v. *Wilsmore* (1 *B. & C.*, 514) and *Ferguson* v. *Carrington* (9 *B. & C.*, 59). In the latter case, goods had been purchased on credit and were paid for by the acceptances of the purchaser. Immediately after receiving the goods, the purchaser sold them at reduced prices. In an action brought against the vendee before his acceptances had become due, Lord TENTERDEN, Ch. J., said that if the defendant had obtained the goods with a preconceived design of not paying for them, no property passed to him by the contract of sale, and it was competent for the plaintiffs to bring trover and treat the contract as a nullity, and consider the defendant not as a purchaser, but as a person who had tortiously obtained possession of the goods. *Buckley* v. *Archer*, 21 *Barb.*, 585 ; *Irving* v. *Motley*, 7 *Bing.*, 543.)

In *Cross* v. *Peters* (1 *Greenl.*, 376), cited by defendants counsel, it was held that the mere insolvency of the vendee and the liability of the goods to immediate attachment by his creditors, though well known to himself and not revealed to the vendor, was not of itself sufficient to avoid the sale. The decision, in that case, was put upon the ground that the credit was in fact obtained without any fraudulent intent, and the validity of the sale made to depend upon the decision of the question whether there was fraud in fact. (2 *Kent's Com.*, 514 ; *Powell* v. *Bradlee*, 9 *Gill & John.*, 220, *referred to by Parsons as an excellent case*, 2 *Parsons on Cont.*, 270, *note W.*)

In *Powell* v. *Bradlee*, the purchasers of the goods in question were insolvent. The jury were instructed that by the sale and delivery of the goods the title vested in the purchasers, notwithstanding they were insolvent at the time of such sale and delivery, and knew that they were so insolvent, unless the jury should also find that at the time of such sale and delivery they knew that they were not able to pay for the goods and that they would not be

able to pay for them, and neither intended nor expected to pay for them, and made the purchase and obtained the delivery with such knowledge, expectation and intention. The Court of Appeals regarded these instructions as calculated to "bewilder, embarrass and mislead the jury," and, therefore, erroneous, and held that it was sufficient for the jury to find that the purchasers knew themselves to be insolvent and had no reasonable expectation of paying for the goods.

*Smith* v. *Smith, Murphy & Company* (21 *Penn.*, 367) was much relied upon by the defendants' counsel. The case, in its principal features, bears a close resemblance to that now in hand. Goods had been purchased upon credit, and a note given by the purchaser. Before the term of credit had expired, the goods were subjected to executions issued upon judgments confessed by the purchaser in favor of preferred creditors. The vendors, before the sheriff sold, claimed the goods, on the ground that the sale was fraudulent and vested no title in the defendant in the executions. The sheriff having refused to surrender the goods, the action was brought against him. Upon the trial, the court charged the jury in substance, as the jury were charged in the case now under consideration, that a purchase of goods vests a voidable title in the vendee, if at the time of the purchase he knew, and did not reveal the fact, that he was unable to pay, and intended not to pay, even though he made use of no deceptive assertions or false or fraudulent representations to induce the sale. In other and fewer words, the jury were instructed that an intention not to pay, and conscious and unrevealed insolvency, rendered a purchase fraudulent. Upon error, it was held by a majority of the court that, to avoid a sale in such a case, some overt act of fraud, practiced upon the vendor and fitted and intended to deceive him, must be established. The argument of the learned judge who delivered the opinion of the court is bold and original; but it is equally specious and unsound. He sets out with a proposition to which few will yield their

Nichols *v.* Pinner.

assent.   It is, that a purchase of goods, with intent not to pay for them, though dishonest, is not fraudulent.    The fallacy of his entire argument is the result of this groundless distinction.   I say groundless, for I do not understand that, when applied to a transaction like that under consideration, any such distinction exists.   So long as the dishonest purpose remains unexecuted, the law takes no cognizance of it. But when executed, and it results in injury to another, the law pronounces the transaction fraudulent, and offers its remedies for the redress of the injured party.   Whether the dishonest end is effected by what is called, in the opinion to which I am referring, an overt fraudulent act, as false representations or artifice, or by the mere suppression or concealment of the real purpose with which the act is committed, it is alike fraudulent.   The dishonest intention, executed, constitutes fraud.   So that, whether the dishonest purchaser is able to deprive his victim of his property by means of an unconscientious advantage of the confidence he has already secured, or is obliged to resort to further devices before he can obtain such confidence, the transaction is regarded in the same light, in law as well as in morals.   In either case, the party who has been deprived of his property may have it restored to him, by establishing the fact that it has been obtained from him with a design to defraud him.   Where there is no "overt act of fraud," it may be more difficult to prove the dishonest purpose; but when proved, it is equally fatal to the validity of the transaction. In such cases, instead of proving false representations or other fraudulent practices, it is necessary, as in a thousand other cases, to resort to the various incidents and circumstances which evince, sometimes with unerring certainty, the hidden purposes of the mind.   In asserting that there must have been actual artifice, intended and fitted to deceive, before a vendor can reclaim his property on the ground that he has been defrauded, the case cited stands alone.   It is equally unsupported by principle.

In the case now in hand, the jury were told that the plaintiffs could not recover, unless they found, from the evidence, that Pinner had procured the possession of the goods fraudulently, with the preconceived design of not paying for them. This charge is unobjectionable. It is almost precisely in the language of Abbott, Ch. J., in *Bristol* v. *Wilsmore* (1 *Barn. & Cress.*, 521), where it was said, under similar circumstances, that whether the defendant obtained possession of the goods with such a preconceived design, was a question of fact to be left to the jury.

The judge, at the trial, was requested to charge the jury that if they should find that "the only fraud was Pinner's concealing his circumstances at the time of the purchase, that such concealment was not fraudulent, because he was not bound to disclose his circumstances." I think there was no error in refusing so to charge. The judge had already submitted the case to the jury upon the single question whether the goods had been procured with a preconceived design not to pay for them, informing them that if they were thus procured the transaction was fraudulent and the title never passed from the plaintiffs to Pinner. No question had been submitted in relation to the insolvency of Pinner. Nothing had been said to the jury on that subject. It was certainly competent for them, in determining the question upon which, according to the charge, their verdict was to turn, to take into consideration the circumstances of Pinner when he obtained the goods. It was not claimed that the mere fact of his insolvency, or the further fact that he omitted to disclose such insolvency, was sufficient to avoid the sale. If the judge had been requested to instruct the jury that insolvency, with a knowledge of such insolvency and an omission to disclose the fact, would not, of themselves, render the purchase fraudulent, perhaps it would have been his duty to comply with such request. But the proposition which the defendants' counsel asked to have submitted to the jury was very different. It was, in

short, that though Pinner was insolvent at the time of his purchase, and knew it, yet it was not fraudulent for him to conceal that fact from the plaintiffs. The proposition itself is not tenable. It has been conceded that known insolvency, though undisclosed, would not be sufficient to avoid the sale, if the purchase was made with an honest intention. But the proposition now before us involves another element. It speaks of concealment. The very term, implies something fraudulent — a willful withholding of some fact — an intentional suppression of the truth — *aliud est celare, aliud tacere.* A man may be innocently silent; but when he intentionally withholds the truth, that he may take advantage of another's ignorance, he acts dishonestly. Such a suppression of the truth is fraud. "If a buyer *conceals* a fact that is vital to the contract," says STORY, J., in *Conyers* v. *Ennis* (2 *Mason*, 236), "knowing that the other party acts upon the presumption that no such fact exists, is it not as much a fraud as if the existence of such fact were expressly denied or the reverse of it expressly stated?" (*Id.*, 6 *Cow.*, 116 ; *Lupin* v. *Marie*, 2 *Paige*, 172.)

The judge at the circuit, therefore, was not called upon to charge the jury that it was not fraudulent for Pinner to conceal from the plaintiffs a knowledge of his circumstances.

Upon the purchase of the goods by Pinner, he gave the plaintiffs his own negotiable notes for the amount. The judge charged the jury that before they could render their verdict for the plaintiffs, they must be satisfied that prior to the commencement of this action the notes had been tendered to the defendant Michael. The notes were produced upon the trial, and the plaintiffs' counsel offered to cancel them. It is now insisted that it was not enough that the plaintiffs produced the notes and offered to cancel them, or even that they were tendered to Michael before the commencement of the suit; but that, to effect a complete rescission of the sale, it was necessary to tender the notes to Pinner himself before bringing the action. I do not

understand that this was required. Indeed, I think the judge, at the trial, went too far in requiring the plaintiffs to satisfy the jury that the notes had been tendered to the assignee Michael; all that was necessary was, that the notes should be produced to be surrendered upon the trial.

It is true that, when a vendor exercises his right to rescind a sale on the ground of fraud, he must do what he can to restore the parties to their original position. He cannot rescind it in part and affirm it in part. If he has received anything of value on account of the sale, whether it be money or other property, or the negotiable security of a third person, he must restore it before he is entitled to have back his own property. (*Kimball* v. *Cunningham*, 4 *Mass.*, 502; *Masson* v. *Bovet*, 1 *Denio*, 69; *Baker* v. *Robbins*, 2 *Denio*, 136; *Wheaton* v. *Baker*, 14 *Barb.*, 594; *Fisher* v. *Fredenhall*, 21 *Barb.*, 82; *The Matteawan Company* v. *Bentley*, 13 *Barb.*, 641.)

But this rule has never been applied to the case of a note given by the fraudulent vendee, not negotiated. This was the only question before the court in *Thurston* v. *Blanchard* (22 *Pick.*, 18). It was there held that a note though payable to order, whilst it remains in the hands of the promisee, the vendor of the goods, is nothing more than an express promise to pay for the goods, and would be avoided with the sale.

It is necessary to produce such a note at the trial, to be surrendered, to rebut the presumption which might otherwise arise, that it had been negotiated; but such surrender has never been held to be a condition precedent to the right to maintain an action. The same question was decided in the same way in *Stevens* v. *Austin* (1 *Metc.*, 557), *Ladd* v. *Moore* (3 *Sand. S. C. R.*, 589) and *Nellis* v. *Bradley* (1 *id.*, 560). The case is quite analogous to that of an action for goods sold and delivered, after a note given upon the sale has been dishonored. It is necessary to produce the note upon the trial, to rebut the presumption that it is outstanding against

the purchaser. This being done, there is nothing in the way of a recovery in such an action.

The only question yet to be considered is, whether the action can be maintained against the defendant Pinner, he having, before the suit was commenced, transferred the property to Michael, by assignment. The complaint is for the wrongful detention of the goods. At the common law, the form of the action would have been *detinue.* The foundation of the action was the *wrongful detainer.* It could not be supported against a person who never had possession of the goods, but it could be maintained against one who, having had possession, had wrongfully delivered them to another. (1 *Chitty's Pl.,* title "*Detinue.*") In *Garth* v. *Howard and Fleming* (5 *Carr. & Payne,* 346), detinue was brought to recover a quantity of the plate which had been deposited with Howard, as bailee, and which he had pledged to the other defendant as security upon a loan of money. Upon the trial, it was insisted that, to sustain the action against Howard, it must be shown that, at the time the action was brought, the plate was potentially in his possession; but TINDAL, Ch. J., said: "The question is, whether Howard has wrongfully pledged the plate. If he has, he is answerable." So, in *Jones* v. *Dowle* (9 *Mees. & W.,* 19), a recovery in the action of detinue against a defendant who, at the time the suit was brought, had neither the possession nor the control of the property, was sustained. (*Drake* v. *Wakefield,* 11 *How. Pr. R.,* 106; *Brockway* v. *Burnap,* 16 *Barb.,* 309, and cases there cited.)

In the revision of the statutes of this state, in 1830, the revisors declared it to be their purpose so to extend the action of replevin as to make it a substitute for *detinue,* and a concurrent remedy in all cases of the unlawful caption or detention of personal property, with *trespass and trover.* (3d vol. Revisors' Reports, p. 122.) From the time the Revised Statutes went into effect until the adoption of the Code, it was generally understood that this object was accomplished

by the first section of the title of the Revised Statutes relating to replevin. (2 *R. S.*, 522.) In numerous cases, the action was sustained against parties who had parted with the possession of the property, by sale or otherwise, before the action was brought. Some of these cases are cited by HAND, J., in *Brockway* v. *Burnap* (16 *Barb*, 309). I am not aware that it was ever doubted that replevin in the *detinet* would lie whenever the common law action of *detinue* might have been sustained.

The Code does not undertake to define the cases in which the action of replevin, or, as its framers saw fit to call it, the action to recover the possession of personal property, might be brought. It simply prescribes the mode of proceeding in such actions. The provision of the Revised Statutes which declares that replevin may be brought for the recovery of any goods or chattels which shall have been wrongfully distrained or otherwise wrongfully taken, or shall be wrongfully detained, is still in force and operative. The action may be maintained now in the same cases in which it could be maintained before the adoption of the Code.

Various provisions are contained, both in the Revised Statutes and in the Code, in respect to the possession of the property which is the subject of the action *pendente lite*. In some cases, the plaintiff may hold the property pending the action. In other cases, the defendant may hold it. In some cases, where the property cannot be found, the defendant may be arrested and required to give certain security. Provision is also made for the recovery of the value of the property by the successful party, where the property itself cannot be obtained. Some distinguished judges, who have bestowed much attention upon the question, have supposed that these provisions, collateral as they are to the main object of the action, furnish evidence of an intention on the part of the legislature to restrict the action to cases in which, at the commencement of the suit, the defendant is " poten

tially in the possession of the property." The late Mr. Justice SANDFORD, in a very able opinion, in which the court of which he was an ornament concurred, has attempted to show that· such was the legislative intent, and that the action to recover personal property cannot be maintained where the defendant has not, in fact or in law, the possession or control of the property claimed. ( *Roberts* v. *Randel*, 5 *How. Pr. R.*, 327; *S. C.*, 3 *Sand.*, 707; *Brockway* v. *Burnap*, 12 *Barb.*, 347.) I have myself been inclined to adopt the argument and yield to the doctrine of these cases. But upon more mature consideration, I am convinced that the boundaries of the action of replevin, as they were established upon the revision of the statutes in 1830, remain unchanged, and that now, as heretofore, the action will lie for the wrongful detention of property in every case in which, at common law, detinue would have been the proper form of action. The defendant Pinner having, according to the verdict of the jury, obtained the goods fraudulently, cannot protect himself from liability by showing that he has wrongfully transferred them to his co-defendant. I am of opinion that the judgment of the Supreme Court should be affirmed.

ROOSEVELT, J., concurred in this opinion; all the other judges were for reversing the judgment upon the ground that the judge at circuit erred in refusing to charge as requested by the defendants.

Judgment reversed and new trial ordered.