HOTCHKINS *v.* THIRD NAT. BANK OF MALONE.

(*Supreme Court, General Term, Third Department.* September 25, 1890.)

1. SALE—RESCISSION—FRAUD OF PURCHASER.

In an action to rescind a sale for fraud and to recover the property, plaintiff must establish representation, falsity, *scienter*, deception, and injury, and all these must concur before a recovery can be had.

**2. SAME—REPRESENTATIONS OF SOLVENCY.**
 Statements by a purchaser as to his solvency, made in April, cannot be legally regarded as an assertion of his financial standing in October and November following.

Appeal from judgment on report of referee.

Action by Cornelia P. Hotchkins against the Third National Bank of Malone. Defendant appeals.

Argued before LEARNED, P. J., and LANDON and MAYHAM, JJ.

*William P. Cantwell,* for appellant. *James Devine,* for respondent.

MAYHAM, J. This is an appeal from a judgment entered upon the report of a referee in favor of the plaintiff, in an action to recover the possession of 79 top buggies, or the value of the same, if they cannot be returned. The complaint alleged that the defendant's vendor obtained the carriages from the plaintiff by false and fraudulent representation of his solvency, and thereby induced the plaintiff to sell and deliver them to him upon credit, and that defendant, in whose possession they were at the time of the commencement of the action, was not a *bona fide* purchaser for value. The answer denies the fraudulent purchase, and also denies any knowledge of fraud in the purchase of said wagons from plaintiff; also alleges the purchase of them by the defendant in good faith, and for a valuable consideration. The referee found for the plaintiff, and judgment was entered upon his report.

The proof shows that Lyman J. Folsom, on the 11th of October, 1886, ordered from the Hotchkins Manufacturing Company 50 wagons on eight months' credit, with interest after four months, at $48; and on the 20th of November, 1886, 25 side spring, at $45, and 25 brewsters at $55. These purchases were made by letter and telegrams carried on between Folsom in person and A. J. Hotchkins, as agent for the plaintiff, who was the husband of the plaintiff, acting under the name of the "Hotchkins Manufacturing Company." The plaintiff insists that these purchases were made by Folsom with the fraudulent purpose of getting possession of these wagons, and disposing of them, with the intent of cheating and defrauding the plaintiff out of the price or value of the same, intending at the time not to pay the plaintiff for them. In support of this allegation, she relies chiefly upon an alleged statement made by Folsom to the agent of the plaintiff, A. J. Hotchkins, on the 13th of April, 1886, while negotiating the purchase of wagons on time, that he was solvent, and worth $15,000. The case does not disclose that any other representations were made by Folsom as to his solvency. At the time of these transactions Folsom was sheriff of Franklin county, and was engaged in large business enterprises. The carriages bought by Folsom in October and November were all shipped by the plaintiff between the 18th of October and 10th of December, 1886. On the 11th of November and 13th of December Folsom executed to the defendant two bills of sale of the carriages in question. The first bill of sale was of 30 top carriages of A. J. Hotchkins make, of Syracuse, N. Y., to hold "as collateral security for any and all overdrafts or past-due paper that they may have or hold against me now or any time in the future." The bill stated where the carriages were stored, and that they were unincumbered, and no claim against them of any kind. The second bill of sale recited that L. J. Folsom was indebted to the Third National Bank of Malone in the sum of $3,500 for borrowed money, and, "for the purpose of securing said debt and interest, and any and all renewals of notes therefor, sold, assigned, transferred, and set over to the said bank 50 carriages, being the same now stored by me on fair grounds of Malone, N. Y., being side-spring piano-box carriages, Hotchkins Manufacturing Company make," authorizing the bank at any time to take and sell the carriages, etc. On the night of March 1, 1887, Folsom died, but up to the time of his death was, in addition to discharging the duties of his office, actively and extensively engaged in business, dealing

in horses, carriages, and other property, and keeping a livery.  On the death of Folsom the defendants took actual possession of the carriages in controversy, and claimed to own and hold the same under the "bill of sale."

The case turns chiefly upon the question whether Folsom ever had title to these carriages under the sale, or whether that sale was procured by fraud on the part of Folsom, such as would vitiate the sale, and leave the actual title still remaining in the plaintiff, and the apparent title in Folsom.  A purchase was made of the goods by him on credit, and, pursuant to that purchase, the goods were shipped by the plaintiff and received and accepted by Folsom, and were at the time of the sale of the same by him to the defendant in his possession, stored on the fair grounds; and, unless his title was defective by reason of fraud practiced by him in the purchase, he could lawfully sell or pledge the same, and convey a good title to his vendee or pledgee.

In determining this question we must examine and consider the circumstances leading up to and connected with the purchase by Folsom.  Previous to April, 1886, the plaintiff and its immediate predecessor in the business, A. J. Hotchkins, had quite extensive dealings in wagons and sleighs for cash.  On the 13th of April, 1886, as is claimed by the plaintiff, Folsom applied for a "bill of goods on credit, and at that time, as plaintiff claims, asserted his solvency and pecuniary ability, and plaintiff then sold a bill of wagons on credit, the payment of which is not questioned in this case.  On the 28th of September following, plaintiff, by A. J. Hotchkins, agent, solicited of Folsom a further order, and in his letter on that subject uses the following language: "If you want to make some money, I will give you a chance now.  I will sell you fifty (50) or more side-spring buggies, with half-lined or skeleton tops, or rubber, at $45.00 each, on four-month notes, and note to be renewed when due for four months longer, you to pay the interest on last note.  This is a splendid chance for you, and the buggies are all nicely finished, same as you have had, and good wheels.  Please let me hear from you."  This was signed by A. J. Hotchkins as agent.  No reply was made to this letter by Folsom, and on the 30th of September, 1886, plaintiff's agent again writes to Folsom as follows: "Wrote you several days since, making you special low offer for fifty (50) side-spring buggies, and on favorable terms.  Please let me hear from you by next mail."  On the 6th of October, 1886, Folsom, in answer to above, telegraphed: "Send me one sample carriage; will buy more if suits."  On the 9th of October A. J. Hotchkins wrote Folsom as follows: "You are perfectly safe in sending your order for fifty of them by next mail, and you had better do so, as they are selling very fast."  To this letter Folsom, on the 11th of October, 1889, replied as follows: "You may send me fifty (50) jobs on 8 months, with interest after four months at $45.00."  This order was accepted by plaintiff on the same day, and in the letter of acceptance Hotchkins wrote to Folsom for plaintiff as follows: "Of course you know I could not use 8-months paper.  Nothing longer than four months will go at my bank; but will renew four months at maturity."  This constitutes the leading facts, resulting in the October purchase.  The plaintiff, by its agent, Hotchkins, on the 6th of November, 1887, again solicits an order from Folsom in a letter, in which he uses these words: "If you want another bargain, and will keep price to yourself, I will sell you fifty (50) Brewster buggies, with full-lined rubber tops, at $65.00 each, same terms as before, if order is sent by return mail.  The lowest price will be after December 1, $75.00.  You may not be aware that materials of all kinds we use are advancing in cost rapidly; *  *  *  so if you want this chance you had better gobble it at once.  You can advise by telegram, at my expense, or they may be sold."  Signed by A. J. Hotchkins, agent.  To this Folsom replied that he would buy 50 more buggies, bill to date December 1st at four months, with renewal of four months, with interest.  To this Hotchkins replied on the next day, November 16th, that he would sell 25 side springs at $45 and 25 Brewsters

at $65 each, but that this was the last chance, as he would sell no more of either style at that price. And on the 18th of November Hotchkins telegraphed Folsom: "Do you want the buggies? Answer." On the same day Folsom replied by telegram: "Will take 25 side springs; don't want Brewsters,"—and on the next day Hotchkins telegraphed Folsom: "Will ship side springs. Will make price $60.00 for 25 Brewsters." On same day Folsom answered: "Will take side springs; don't want Brewsters." To this Hotchkins telegraphed: "Will sell 25 Brewsters full tops at $55.00. Last chance. Answer." On the 20th of November, 1886, Folsom telegraphed: "Will take 25 side springs at $45.00 and 25 Brewsters at $55.00."

The above is the substance of the negotiations and correspondence between Folsom and the plaintiff for the purchase of the wagons, which is claimed to be fraudulent on the part of Folsom, and under which it is claimed by plaintiff that no title passed. The evidence shows that at the time of these negotiations Folsom was largely in debt; but there is no direct evidence that at any time before his death he supposed himself insolvent; nor is there any direct evidence in the case that at the time it is alleged that he represented himself insolvent and worth $15,000, that was not true in fact; and the plaintiff in this action, having alleged the fraud, has the burden of establishing that affirmative allegation.

It is insisted by the defendant that, under the pleadings in this case, the allegations of the complaint relate clearly and unmistakably to the transactions between the parties in the fall of 1886, and that it was therefore error on the part of the referee to allow proof of the conversation and statement of Folsom in April of that year. We cannot agree with the defendant that this evidence was incompetent, even if the only transactions sought to be assailed in this action were those of October and November, and it is apparent that those are the only sales by plaintiff to Folsom sought to be impeached in this action.

The chief evidence relied upon by the plaintiff to establish her charge of fraud is the indebtedness of Folsom, his incumbrance of his property, or portions of it, from time to time, by bill of sale or mortgage, and the insolvency of his estate after his sudden death. Is that enough? Before the sales can be held void for fraud, the plaintiff must establish by her proof "representation, falsity, *scienter*, deception, and injury, and all these must concur, and the absence of any of them is fatal to recovery." The party to the contract who claims to have been defrauded cannot treat the contract as void for fraud, rescind the same, and recover the property sold in replevin, where he could not, in a direct action brought for that purpose, have the contract declared void for fraud. It follows that the plaintiff in this action, before she can recover, must prove all the elements of fraud that would be requisite to be proved to set aside a contract for fraud. The essential constituents of such an action are false representations, made by a person knowing them to be such, calculated and intended by the party making them to influence the other, communicated to the party intended to be influenced by the same, and in reliance upon which he in good faith acted, and thereby suffers the injury of which he complains; and it is well settled that all these elements must concur, and that the absence of one is fatal to the claim for fraud. *Brackett* v. *Griswold*, 112 N. Y. 454, 20 N. E. Rep. 376. It is elementary that fraud must be proved, and cannot be presumed. *Morris* v. *Talcott*, 96 N. Y. 100. But this may be done, doubtless, by proof of circumstances which are totally inconsistent with truth or an honest purpose; for, if the circumstances relied upon are consistent with honesty and truth, they are to have that interpretation. If, therefore, the circumstances proved in this case do not establish affirmatively all the elements necessary to constitute the fraud complained of, then this judgment must be reversed. In *Coffin* v. *Hollister*, 7 N. Y. Supp. 734, which was an action to recover goods of a general assignee, on the ground that they had been obtained of the plain-

tiff by the defendant assignor by fraud, LEARNED, P. J., refers to *Morris v. Talcott,* 96 N. Y. 107; *Nichols* v. *Pinner,* 18 N. Y. 295; *Bank* v. *Bogart,* 81 N. Y. 108; *Macullar* v. *McKinley,* 99 N. Y. 353, 2 N. E. Rep. 9,—as settling the general principle governing this class of cases, and adds: "In brief, there must have been an intent when the property was purchased not to pay for it, and a condition of known insolvency is not enough. 'The intention not to pay can no more be inferred from the mere fact of insolvency than the fact of insolvency can be inferred from the existence of an intention not to pay.'" In *Morris* v. *Talcott, supra,* it was held that the intent to defraud may not be imputed to the purchaser of property on credit merely from the fact that he was to his knowledge insolvent at the time of the purchase, and that he omitted to disclose such condition to the vendor. It will be observed that this case goes much further than is necessary to go in the case at bar. In the case at bar there is no evidence proving, or legitimately tending to prove, that Folsom at the time of the representation, said to have been made in April, or of the purchase of the goods in October and November, either was insolvent in fact or supposed himself to be such. In *Nichols* v. *Pinner, supra,* it was held that the mere omission of the purchaser of goods to disclose his insolvency to the vendor is no fraud for which sale may be avoided, if the purchaser makes no false statement, and resorts to no artifice to deceive the vendor. In *Bank* v. *Bogart,* 81 N. Y. 108, it was held that "the mere omission of a purchaser of goods on credit to disclose his insolvency to the vendor, in the absence of an attempt to defraud, is not such a concealment as will avoid the sale;" and the court in this case cite upon this subject the language of SELDEN, J., in *Nichols v. Pinner, supra,* and also the rule upon this subject as laid down in Story on Contracts, § 516, where the learned author uses this language: "The general rule, both in law and equity, in respect to concealment is that mere silence with regard to a material fact which there is no legal obligation to divulge will not avoid a contract, although it operates to the injury of the party from which it is concealed."

But it is insisted that in this case there was more than concealment, and that there was affirmative false representation in April, previous to the other sales in October and November. The answer to this is that there is no proof that the declaration or statement, if made in April, was untrue; and, there being no evidence to the contrary, the legal presumption is that the statement, if made as claimed at that time, was true. *Morris* v. *Talcott, supra.* But I do not see how that statement, if made in April, can legally be regarded as evidence of an assertion of the financial standing of Folsom in October and November following. The most that could be claimed for it is that it related to the business dealings of the parties at that time. In *Macullar* v. *McKinley,* 99 N. Y. 358,[1] DANFORTH, J., in speaking of a statement of a purchaser, made in February, when the purchase was made the succeeding August, says: "It cannot be said that the representations of February had any legitimate connection with credit extended in August;" and in *Morris v. Talcott, supra,* the court held the representation made by a party with a view of procuring credit with another may only be held to apply to and affect future credits when they are made in the course of dealings, and under circumstances from which it may be inferred that they were made with an intent to induce continued credit. The evidence in this case would seem to negative the idea that this statement, if made, (and on this appeal, as it is not contradicted, we may assume it was true,) was for the purpose of procuring on credit in October or November, 1886. The reluctance manifested by Folsom, as evidenced by the correspondence, in making the purchases, and the earnest and repeated solicitations of the plaintiff's agent to make the sales, afford strong presumptive evidence of a want of disposition on the part of Folsom

[1] 2 N. E. Rep. 9.

to acquire the possession of goods from the plaintiff, and negative the presumption sought to be raised by the plaintiff that Folsom got these goods with a purpose and intent, at the time of purchasing the same, not to pay for them; and yet, unless the evidence establishes that intent, this action could not be maintained. *Swarthout* v. *Merchant*, 47 Hun, 107. In this case the court says: "An intent to defraud cannot be imputed to a purchaser of property merely from the fact that he was to his knowledge insolvent at the time of the purchase, and that he omitted to disclose such condition to the vendor. These must be accompanied by facts disclosing an intent to acquire the property without paying for it."

But it is insisted that the fact that Folsom's paper went to protest, and that he executed bills of sale which were not recorded, is evidence, not only of insolvency, but of an intention not to pay the plaintiff for these wagons at the time of the purchase. This contention I think cannot, within the authorities cited, be maintained. It is true that in a case reported as *Anon.*, 67 N. Y. 598, it was held that "a banker, who to his own knowledge was hopelessly insolvent, could not honestly continue to receive the deposits of his customers; and, although he had no actual intent to cheat or defraud a particular customer, he will be held to have intended the inevitable consequences of his act." But the court in that case says: "This is not like the case of a tradesman who has become embarrassed and insolvent, and yet has reasonable hope that by continuing in business he may retrieve his fortunes. In such a case he may buy goods on credit, making no false representations, without the necessary imputation of dishonesty;" citing *Nichols* v. *Pinner*, 18 N. Y. 295, and other cases.

The evidence in this case does not warrant the conclusion that Folsom at any time in his life deemed himself hopelessly insolvent, and unable to pay this and all other debts he owed. The law recognizes the fact, "Hope springs eternal in the human breast." As was said by PRATT, J., in *Nichols* v. *Pinner*, 18 N. Y. 299: "It is not fraudulent in him to make reasonable efforts to retrieve his fortune, and to extricate himself from his embarrassment. It is not unnatural that he should cling to the hope that better times would come,— that to-morrow should be as this day, and much more abundant, and that with this hope　*　*　*　he should have been impelled to buy more goods, contract new debts, and struggle on."

I do not deem it profitable or necessary to discuss the point urged by the appellant that the testimony of A. J. Hotchkins is not to be relied upon in this case. It is quite true that his relations with the plaintiff are such as not to relieve him from all suspicions of bias, and that his testimony cannot be met by Folsom, who is dead. But that fact does not render him an incompetent witness, under section 829 of the Code of Civil Procedure. If we are right in the above conclusion, the title to these buggies on the sale and delivery to Folsom vested in him, and with it he acquired the right to dispose of them to the defendant. That being so, it is difficult to see how, in this action, the plaintiff could challenge the defendant's title. This is not the case of a judgment creditor seeking to set aside a transfer of property alleged to have been made in fraud of his rights. There is no direct analogy between this action of replevin and a creditors' bill. The theory of this action is that Folsom never had title to this property, and could therefore convey or transfer none to the defendant; and, if it be held that Folsom's title is good as against the plaintiff, then the plaintiff, not being a judgment creditor, and not bringing her action as such, would not be in a position to inquire into or question the consideration moving between Folsom and this defendant. But it is insisted on the part of the defendant that, if it should be held that Folsom was a fraudulent vendee, whose title might be assailed as between him and the plaintiff, still the plaintiff, having voluntarily parted with the possession to Folsom, and thus given him the evidence of title by such possession, is, as

to the defendant, who is a *bona fide* purchaser for value, estopped from setting up title as against it. The referee in this case having found that the defendant is not a *bona fide* owner of these wagons for value, we are not called upon, in the view we have taken in this case, to review his determination of that question on this appeal.

The plaintiff, as we have seen, parted with her title to Folsom by a valid sale, and cannot maintain this action upon the evidence before the court in this case. The judgment is reversed, the referee discharged, and a new trial ordered, costs to abide the event.