By the Court—-Woodruff, J.
On the trial of this action various exceptions were taken by the defendants to the rulings of the Court, admitting and rejecting evidence, but on the hearing before us the defendants’ counsel disavowed any intention to insist upon any of those exceptions.
*467 And although he placed upon his printed points the suggestion that the Judge erred in charging the jury that “the fact that the vessel sprung a leak so soon after leaving the harbor of Callao, did not raise a presumption that she was unseaworthy when she left,” yet as no exception was taken on the trial to this part of the charge, this point he also passed over on the argument.
Indeed, the express finding that the leakage which rendered it necessary for the vessel to return to Callao was caused by a peril of the sea of an extraordinary character, and the evidence tending to prove that fact, if they do not justify the charge in this particular, probably render it of no importance.
If it had appeared clearly that after the vessel left Callao she encountered no storm nor other extraordinary peril which could be reasonably deemed sufficient to cause the leak, then there would have been a presumption that the vessel was unseaworthy when she sailed. (Van Valkenburgh v. The Astor Mut. Ins. Co., 1 Bosw., 62.)
The proposition as stated in the charge was obviously given in view of the testimony of the Captain, that he encountered heavy seas, very hard, stiff breezes for two or three days, and wind heavy enough to carry away her main top-gallant sails.
As no qualification of the proposition was asked by the defendants’ counsel, and no exception was taken thereto, we do not think it necessary to consider it further.
The arguments addressed to us were that the findings of the jury are against the law and the evidence, both as to the cause of the loss and its extent.
• The vessel left Callao on the 26th of April, 1855, on her voyage around Cape Horn, having a cargo of guano on board. She returned to Callao on the 9th of May following, and (as alleged by the plaintiff) in a sinking condition.
1. The first great question was whether she was seaworthy when she sailed from Callao. That question was fairly submitted to the jury upon the evidence, to which there was no contradiction in terms, and the jury found that she was seaworthy.
The testimony of the Captain to the fact of seaworthiness, and to the perils which he encountered, made out, we think, s prima facie case for the plaintiff both in respect to the seaworthiness of the vessel at the time of her departure, and in respect to actual injury by the causes already above mentioned.
*468 We do not think that a very strong or convincing case was made out in these respects, but it was quite sufficient to render it proper to submit these questions to the jury.
So in regard to the other important questions; what was the extent of the damage, and what would it have cost to repair the vessel ?
Under the direction of the United States Consul, two successive surveys were had by shipmasters and a shipwright. These 'surveys and the estimate made by the shipwright of the cost of repairing the vessel were not only read in evidence by the plaintiff without objection from the defendant, but the Captain by his testimony on the trial affirmed their correctness.
If these surveys and estimate were correct in fact, then the finding of the jury that the vessel was so injured that the cost of repairs after deducting “ one-third new for old ” would have exceeded half her value, was also correct. We cannot say that these proofs in connection with the protest (read in like manner on the trial) did not prima facie establish the facts so found.
So that upon the plaintiff’s case as thus prima facie established, if there was no contradiction there could be no reasonable claim that the verdict was not warranted by the proofs.
And it is proper to observe here that upon the findings of the jury on these points it became entirely unnecessary to consider the point raised on the argument, whether the jury were warranted in finding the amount which it would cost to unload and reload the cargo, for if the loss was constructively total that finding is wholly immaterial.
So also it becomes unnecessary to consider the question also discussed in the defendants’ points whether the inability of the master to procure funds for repairs justified the sale of the vessel. It being found that the cost of repairs, after the proper deduction, would have exceeded a moiety of her value, the loss was constructively total, and if those findings can be sustained her abandonment was justified, whether funds could or could not have been procured with which to make the repairs.
The question therefore recurs, whether we can say that the findings of the jury that the vessel was seaworthy when she sailed from Callao, and that she was injured by extraordinary *469 perils to an extent amounting to a constructive total loss are against evidence.
As already said, these facts were prima facie proved, and although we cannot say that the plaintiff’s proofs are quite satisfactory to our own minds, still the jury might conscientiously and sincerely credit the evidence, and we incline to the opinion that in the absence of contradiction they were bound to give it credit.
The Court, therefore, properly refused to grant the motion for a nonsuit.
We are, however, constrained to say that not only is very great doubt of the correctness of the verdict created by the evidence given on the part of the defendants, but the preponderance of the evidence is greatly against the verdict.
James Pederson was examined by the defendants. He was in no wise impeached, and his testimony seems to us, (by establishing facts which clearly outweigh the opinion of the plaintiff’s witnesses,) to prove that the ship had not sustained any such damage by the perils of the sea as is claimed by the plaintiff, and that no such amount of repairs was necessary to make the ship in all respects seaworthy and capable of taking her cargo of guano to the port of destination.
According to his testimony, he was in Callao about the 1st of June, 1854, three weeks before the ship was sold. His business there was the purchase of a vessel. He examined the ship a number of times before the sale, with a view to becoming the purchaser. Sometimes he was on board alone, and sometimes he took with him friends. His object was to ascertain the condition of the vessel, and he made the examination “ as full as could be made by anybody.” He found her in such condition that he determined to buy her, and he did purchase her at the sale for the sum of $8,100.
After his purchase he again examined her, assisted by two ship carpenters, (one of them being the same who had united in the previous survey above referred to, Mr. A. J. Shute.) The result of Pederson’s repeated examinations, as stated by him, are in direct and irreconcilable conflict with the testimony of the plaintiff’s captain and the surveys he caused to be made, as to the extent of the injuries to the ship and the necessity of repairs. *470 He then had the ship repaired, and had everything done which he considered necessary to make her seaworthy, and the whole expense was only $958.06; and it is ,to be observed that the witness giving this testimony is a ship master and ship owner, who has commanded a vessel for twenty-one years and has been a mariner for thirty-four years, and he cannot be conceived to have had any interest or motive to testify untruly in this matter. His conduct in actually making the purchase, and his subsequent use of the vessel confirm his testimony.
Having completed these repairs, he also caused a survey to be made, by requesting the agents of Lloyd’s to have it done, and. those agents appointed three English ship captains, then in port, to make the survey, which they did on the 7th of July, and they declared that she made no water while they were on board, (though she had about 400 tons of guatio still remaining on board ;) that she appeared a sound, well fastened, efficient ship, newly caulked, well found in boats and sails, and every material of all kinds; and they add that they think her capable of taking a cargo of guano to any part of the world.
There is nothing in the case to justify a belief that this survey was not made and certified with impartiality and truthfulness.
Pedersort then took the command of the vessel, she still having a part of her original cargo of guano on board. He took in about 250 tons more, and sailed to Costa Rica, thence to Paita in Peru; there filled up the ship with cotton on the top of the guano, and sailed thence to San Bias in Mexico, where he landed the cotton in perfect order, and on the 17th of December, 1854, sailed thence for China with the guano, reached Hong Kong March'3d, 1855, and thence to Whampoa, where he landed the guano, and although at least 150 tons of the guano was the same which was on board when the ship is said by the plaintiff’s witness to have leaked so that there was ten feet of water in her pumps, and the same which he testified was so wet that it was good for nothing when he gave up the other portion to the .charterers, Barreda & Brothers; yet Pederson testifies that the guano was delivered at Whampoa in good order, with the exception of 25 or 30 tons, which was partially damaged. At Whampoa he had the vessel put on the dry dock, and made a thorough exami *471 nation; had her stripped of all her copper, caulked and recoppered, and afterwards the seams and the whole sides of the vessel, from the copper to the covering board, scraped white, and found the vessel sound, with the exception of one plank that was a little injured by worms. She was repaired under the inspection of Lloyd’s agents, and his expenses, including some new sails, were about $4,500. With a cargo of 500 tons and 200 China-men he returned to California and delivered his cargo in good order. The vessel has been in good condition ever since, and has been in service ever since; and on the voyages so testified to, no unusual leakage occurred, except perhaps some which was caused by a small auger hole, which will be presently mentioned.
This history is wholly inconsistent with the plaintiff's case, incredible if that case is proved, and seems to require some explanation of the error into which the surveyors, appointed by the United States Consul before the sale, must have fallen if the testimony of Captain Pederson is believed.
That explanation is found in the fact that there were two auger holes bored through the sides of the ship, one of a diameter of one and one-half inches, and the other of one-half or three-quarters of an inch, (the latter partially stopped at one time with paint or putty, and the former partially stopped with a slack plug,) and having the appearance of having been bored from the inside of the ship, and so near the water line that when the ship was loaded they were some four feet under water.
The first of these holes Captain Pederson discovered before he purchased the ship, and it being repaired, no considerable leakage occurred afterwards, except from the small hole, which he found on his voyage to China or after he arrived.
The existence of these holes, together with another which had been bored near one of them, but not through the side, was very strong evidence that at some time they were voluntarily made in order to admit water, and probably with a view to sink the ship.
No evidence was given showing when these holes were made. If they were fraudulently made after the ship sailed from Callao for the United States, that might not have defeated the Policy which covered barratry of the master and mariners; and if made before, it may not have established such negligence in not dis *472 covering and repairing the injury as would defeat the Policy. But the testimony does tend very strongly to show that the leakage on that voyage did not arise from the causes assigned, and that the repairs necessary to make the ship seaworthy were not at all such as were estimated before the sale.
The existence of these holes seems to us, in connection with Pederson’s uncontradicted and unimpeached testimony, to explain and in a great degree remove from the surveys made by the surveyors appointed at the instance of the captain, the force and effect which might otherwise be claimed for them. Those surveyors finding that the water had actually entered the ship, and not discovering these holes, could not easily avoid the conclusion that the leakage was caused by the straining of the vessel and opening of her seams, which of course they imputed to the action of the wind and waves. It is not, therefore, any imputation upon their integrity to say that they were mistaken. And the like suggestions may explain the testimony of the captain, in the absence of evidence that he acted fraudulently.
The facts stand prominently before us that the ship was repaired for comparatively a small sum; that she was pronounced seaworthy for the carriage of guano to any part of the world; that she made three voyages with nearly as much guano on board as she had when she put back to Callao ; and she is still in good condition, and all repairs since those voyages, added to those made at Callao, have cost far less than the amount required to justify her abandonment. True, she has not been around Cape Horn; but it is also true that, at the time she put back to Callao, she had only been a few days on her voyage in that direction, and the evidence of violence from wind or waves is very slight.
We think that we ought not to be, and consistently with just regard to the rights of the parties cannot be, satisfied with the verdict in this respect.
2. In relation to the freight, however, the verdict is even less satisfactory, for notwithstanding it be found that there was a constructive total loss of the ship, it was the duty of the master to earn freight if he could by forwarding the cargo by another vessel. (American Ins. Co. v. Center, 4 Wend., 45; Schieffelin v. New York Ins. Co., 9 J. R., 21.)
*473 His service had been in part performed: the vessel had been from San Francisco to the Islands, and had taken her cargo of guano on board at the expense of the ship owner, and returned to Callao for her final clearance. This service cannot be regarded as entirely without value if a vessel could there be found to take the cargo forward. There the Captain voluntarily gave up what he deemed the dry part of the cargo to the charterers, (Barreda & Brother,) and they sent it on by the Parana.
These facts are uncontradicted; 'they are proved by the plaintiff’s witness, the Captain himself; and yet the jury have found that, “from any evidence submitted to them, the Master could not have sent that part of the cargo to the United States by any vessel, the use of which he could have procured at Callao.”
And in consequence of that finding they have omitted to answer the questions, what would have been the expense oí transhipment, and whether any freight would have been earned thereby, and whether the extra expense would have exceeded the moiety of the freight ?
We do not find in the case any evidence showing what the expense would have been, nor what it would have cost if the Captain had forwarded the guano himself.
But the finding that no vessel could be procured is in palpable conflict with the fact that a vessel was procured, and the Captain voluntarily gave up the guano to the freighters, and they sent it on.
What has already been detailed respecting the subsequent history of the residue of the cargo, and that it was in fact taken to China, and there delivered in good order, excepting from 25 to 30 tons, bears also on this same question of duty on the part of the Captain to procure another vessel and send that also.
To this is to be added that the burden of proof that no other vessel could be had, is held in Schieffelin v. New York Insurance Company to be on the plaintiff, and that to entitle himself to recover on the ground of the loss of the voyage, he must show that another vessel could not be obtained. (3 Kent Com., 210, 213 ; 2 Arn. on Ins., § 347, pp. 1139-1144; Shipton v. Thornton, 9 Ad. & El., 314.)
We cannot, it is true, say that, had the cargo been forwarded by another vessel, the loss of freight would not have exceeded a *474 moiety thereof, or that abandonment 'within the case of the American Insurance Company v. Center, (above cited,) would not have been justified. But the verdict of the jury is palpably wrong upon the main fact, that no vessel could be procured; or if its somewhat ambiguous language be taken to import only that no evidence had been given that a vessel could be procured, then the plaintiff failed in establishing this main fact, and no means are supplied of determining whether the loss was or was not constructively total. It may be very probable that it would have cost nearly as much to send the guano by another vessel as the plaintiff would have received, but that is not proved.
Besides, when the owners of the cargo accepted the undamaged portion of the cargo at Callao, the Master might have required the payment of freight pro rata itineris, if their acceptance was voluntary; and if they took it because the Master declined to take it forward, or to send it on by another vessel, then also it was the fault of-the Master, and does not entitle the owners to say that no freight was earned as between them and the defendants. (2 Bosw., 195; 2 Duer, 204.) It cannot be that nothing was earned which would have been properly assigned by way of apportionment to the service rendered in going to the Islands and lading the guano, and bringing it to Callao. How much was so earned the Court cannot say, but the finding of the jury that no freight was earned, if it imports that this service was of no value or formed no aliquot part of the whole service-which the plaintiff was to perform for the freight stipulated, was not warranted by the evidence. As the case stands, it seems to us that only a partial loss of freight was proved, and that enough ismot shown to determine its extent or amount.
The finding of the jury that no freight was earned, is also in conflict with one of the instructions given by the' Judge at the trial upon admitted facts.
The charter-party, after providing that the vessel should go from San Francisco, in California, to the Chincha Islands, and there load at the ship’s expense—carrying any specie necessary to pay for the guano—any tools and bags for dunnage, free of freight, and deliver water required at guano ports free of charge; the crew to sew up the mouths of the sacks, and the owners of the vessel to pay all port charges, and that the vessel *475 should return, when all this was done, to Callao for final clearance for the United States; and after, also, stipulating that the freight to be paid shall be $15 per ton, then proceeds:
“ The Master to be supplied at Callao with a sum. not exceeding one-third of the freight, free of interest and commission, which is to be in part payment of the freight, at the exchange of twelve per cent premium, together with the cost of insurance on such advance. And should the charterers or their agents think fit to advance any farther sum on the credit of the freight for repairs, stores and disbursements, such sums, with premium, interest, commission and insurance, to be considered in part payment of freight.”
In pursuance of these provisions, the Master received from the charterers over $4,000. Whether this was equal to or exceeded the one-third of the freight above firstly mentioned, we have no data by which to determine. Out of the proceeds of the sale of the vessel the Master repaid this sum, on the claim of Barreda & Brother that, as the voyage was broken up, they were entitled to have it repaid as freight not earned.
On the trial, the Judge charged that the defendants would be entitled to have deducted from the amount of loss on freight “ a ratable proportion of the value made by Barreda & Brother to the Captain, as so much freight earned by way of salvage.” This language, though not very clear, we suppose imports that the sum of $4,000 so received was to be regarded as freight earned, and that the Captain had no right to refund it, and the charterers were not entitled to have it repaid.
This ruling is in conformity with the decision in De Silvale v. Kendall, (4 M. & S., 37,) in which the provision for part payment of the freight before the voyage was completed, was singularly like the present. If there is any difference, the present case is even stronger; for here, by charging the plaintiff with the premium of insurance, the charterers have, in the most decisive manner, indicated an intent to pay the freight to that extent absolutely, place that amount at the risk of the voyage, and so acquire an insurable interest therein. And every other reason assigned in De Silvale v. Kendall applies with equal force in this case. To the extent of one-third of the freight, the charterers were bound to regard it as a payment. They were neither to charge *476 interest nor commissions thereon. Whether an advance under the further clause beyond one-third would stand on a different footing, it is not necessary to say. That is called an advance on the credit of the freight, and is to be allowed, both interest and commissions—in that respect having more the appearance of a loan to the owners.
It is not, in strictness, a payment in advance of the whole service to be rendered, in which nothing has been done by the ship-owner that entitles him to be regarded as meritorious. Although freight is not regularly payable till the cargo is delivered, no rule of law forbids that the parties should stipulate to pay at successive stages of the voyage as the service is in part performed, and so each become sharer in the subsequent risk of the final completion of the voyage.
Indeed, under special terms used in the contract, a payment in advance has been held to be in consideration that the goods were received on board, and so not to be recoverable back, though the vovage was broken up.
Here, for aught that we can say, the service performed by the plaintiff, down to the time the ship left Callao, was justly equal to the sum advanced. The payment then made was, according to the contract, to be payment, and not a loan; and the contract fairly imports that, to that extent, the risk of loss of freight was assumed by the charterers from that time. (See, on this subject, Andrew v. Moorhouse, 5 Taunt., 435; Saunders v. Drew, 3 Barn. & Ad., 445; Winter v. Haldimand, 2 id., 649; Manfield v. Maitland, 4 Barn & Ald., 582; Watson v. Duykinck, 3 J. R., 335; Phelps v. Williamson, 5 Sandf., 578; Ogden v. The Gen. Mut. Ins. Co., 2 Duer, 204.)
It is true that the jury have not attempted to find the amount to be recovered; but they have disregarded the instructions of the Court, and, in answer to a question which assumes that the advance by the charterers must be taken as payment on account of freight, have, nevertheless, found that no freight was earned.
The amount to be recovered, the Judge reserved for adjustment ; but, without disregarding this finding, no allowance could be made for the freight so received.
Indeed, the whole verdict proceeds upon the idea of a total loss of both vessel and freight; and the necessary details to render *477 an adjustment of the amount due on the policy on freight treated as a partial loss are not ascertained. And without some proof of the cost of forwarding the cargo by another vessel, they cannot be ascertained.
We think a new trial is necessary to the proper determination of the rights of the parties.
Mew trial ordered, costs to abide the event.