Smith, P. J.
The respondents, who were bankers in the city of New York, under the firm name of Henry Clews & Co., failed in business on October 2, 1874. They had been preceded by another firm of the same name, composed of the defendant Clews and Theodore Fowler, which firm had failed in September, 1873, and thereafter had carried on business in the name of “Henry Clews & Co., trustees,” until some time in January, 1874, when they dropped the designation of “trustees.” Fowler retired from the firm, and the defendants formed their firm of Henry Clews & Co. During all that time, the plaintiffs, who were bankers at Sherman, in the county of Chauatuqua, had done business with the successive firms above mentioned, sending them paper for collection and making drafts on *43 them, from time to time. At the time of the failure of the defendant’s firm in October, 1874, they were owing the plaintiffs the sum of $6,527.53, for moneys received, by them on the plaintiffs’ account, during the ten days next preceding their failure. The recovery, which is against the defendant Clews alone (Zeidler not having been served with the summons nor appeared in the action), is for that sum with interest. In view of the charge of the learned judge who presided at the trial, it is apparent that the only ground upon which the jury rendered their verdict was this: That the defendant’s firm being insolvent when the plaintiffs’ money was received, the defendant Clews, knowing the fact of such insolvency, concealed it from the plaintiffs, and received their said money intending not to pay it, and with the design of cheating the plaintiffs out of the same. Several exceptions were taken by the defendant, but before considering them, attention will be given to a very serious question presented by the contention of the appellant, that the verdict is against the weight of evidence.
It is not necessary to spend time upon the testimony relating to the insolvency of the defendants Their liabilities were shown to amount to the sum of $252,464.08, and their assets to be of the nominal value of $269,212.17. The actual value of the assets was fluctuating and somewhat uncertain, as they consisted, to a great extent, of bonds and stocks of various corporations, in respect to Avhich the quotations in the stock market are generally regarded as the best indications of value. It may be assumed for the present purpose, that at all times during the ten days next preceding their failure the defendant’s affairs were in such a state, as that their assets, if forced to a sale, would not have produced enough to pay all their liabilities, and that the appellant was fully aware of that condition of their *44 affairs. But the fact of insolvency, and the defendant’s knowledge of it, and his omission to disclose it to the plaintiffs, are not enough of themselves to warrant the imputation of fraud. If the defendant, relying upon his skill and experience as a banker, his credit and the means at his command, expected and believed upon reasonable grounds that his firm could continue business and pay the plaintiffs and their other creditors, as their debts matured, his conduct was not fraudulent (Nichols v. Pinner, 18 N. Y. 295; S. C., sub nom. Nichols v. Michael, 23 Id. 264, per Selden, J., p. 274); and so the trial judge substantially charged.
It is hardly necessary to recur to the familiar doctrine that fraud must be proved, not presumed. In the absence of evidence, the presumption is against fraud, and although fraud may be made out by circumstantial evidence, the circumstances must be such as to overcome that presumption. It is not sufficient, , that the facts are ambiguous and just as consistent with innocence as with guilt; if taken together they are consistent with an honest intent, the fraud is not established. (Shultz v. Hoagland, 85 N. Y. 464.)
N ow, the very first item of proof resorted to by the plaintiff to show the insolvency of the firm and the appellant’s knowledge of it, was an extract from the appellant’s answer which admitted the suspension of the firm of Clews & Zeidler, but alleged in connection with such admission, that up to the time of such suspension the appellant “believed, and had good and sufficient reason for believing, that said firm would be able to continue business and to pay its creditors in full.” The plaintiffs’ next item of evidence on that subject was an extract from an affidavit of the defendant Clews in the following language, to wit: “That in proving the entire good faith with which said Henry Clews & Co. continued their business down to October *45 2, 1874, it will he necessary to call, among other witnesses, Hiram B. Crosby, Esq., who resides in the city of Hew York, and who will testify that at, and for some time prior to said suspension, he was the agent of said Henry Clews & Co., and was then in London, England, for the purpose of negotiating a large loan of money on certain bonds of Henry Clews & Co.; that he had reasonable hopes of success in obtaining said loan down to about the time of such suspension, and that if he had succeeded such suspension would not have been likely to occur.” However cogent these declarations of the appellant may be to show the embarrassment of his firm and his knowledge of it, they seem equally cogent evidence that up to the time of the suspension, and at the time when he received he plaintiff’s money, he believed that his firm would be able to go on.
This testimony tending to show the belief of the defendant in the ability of his firm to continue their business, is fortified by other testimony produced by the plaintiffs. They read in evidence a part of the deposition of Mr. Timpson, a banker, who stated that he was acquainted with the value of stocks and bonds generally; that he was the trustee in bankruptcy of the defendants; and that when their assets came into his hands, in March, 1875, he considered that with judicious management they would pay the debts. Like testimony was given by Mr. Loomis, a witness produced by the defendants, formerly the president.of a Connecticut bank, to which the old and the new firm were indebted, who stated that he was one of a committee appointed by his bank to investigate the affairs of the old firm immediately after its suspension; that Mr. Clews presented his assets to the committee, and stated the ground of his belief that he was going to raise a certain amount of money on them; that the *46 committee desired him to go on and to utilize the advantages of his long experience and good credit, believing he would be able to realize from his old assets to pay everything in full; and that the witness approved of the continuance in business of the new firm up to the time of their suspension in October, 1874.
What is there in the case to overcome the force of this proof of an honest intent, most of which was introduced by the plaintiff ? First, the plaintiffs called as a witness Mr. Green, who testified that soon after the suspension of the first firm in September, 1873, he in behalf of the plaintiffs, had an interview with Mr. Clews, and on that occasion the latter said to him that “they were able to pay two dollars for every one they owed, bat were not able to convert their securities.” This testimony was objected to as immaterial and irrelevant, but the objection was overruled. It is to be borne in mind that this remark was made in September, 1878, respecting the financial condition of the th~n 'firm of Henry Clews & Co , composed of Clews and Fowler. What legitimate bearing had it upon the question of the intent with which Clews, as a member of the subsequent firm, composed of himself and Zeidler, received the plaintiffs’ money more than a year after-wards % None, whatever, unless it is to be assumed that Clews had then conceived, and ever afterwards entertained the design of committing the fraud now imputed to him, and that the remark was made as a means to that end. But the unreasonableness of that assumption is shown by thefact that although the plaintiffs continued to deal with the successive firms of Henry Clews & Co., and to trust money in their hands, all that was owing to them, and to all other creditors, as well, was paid, and for aught that appears, paid promptly and satisfactorily, until the claim in suit accrued.
But, again, the remark in question was of no rele *47 vancy whatever as evidence, unless it was false, and known to be so, when made, and was made- with intent to deceive. But is it not apparent that the remark was a mere expression of opinion? The business of the firm was extensive. If their liabilities were large, so also was the amount of their assets. It appears from the schedules subsequently drawn up, that the debts were $5,382,468, and the nominal value of the assets was nearly a million greater. But no schedules had then been prepared, and the remark was made, so far as appears, without looking at the books of the firm. It seems to us a forced and unnatural view of the matter to hold that a remark manifestly intended and understood as a mere estimate, and so remote in point of time and circumstance from the transaction in issue, can be treated as evidence of a fraudulent intent in such transaction.
Another item of evidence relied upon by the plaintiffs to show a fraudulent intent, is the testimony of one of the plaintiffs, that in January, 1874, Clews wrote him to “drop the ‘Trustee,’ as their matters were all arranged.” The letter was not produced, and it may be assumed that the witness gave only, his recollection of its substance. That remark, also, in whatever words it was expressed, 'related to the affairs of the earlier firm. It. has no possible bearing, upon the point in issue, unless it can be treated as a statement that all the debts of the firm had been paid, and as made with the intent of getting the plaintiffs’ money at some subsequent time and not paying it back. But does it, by fair construction, mean anything more than that the firm had so arranged their matters (whether by payment, or extension of credit, or how otherwise, was not stated) as that they could drop the designation of “Trustee,” and resume business on the old basis. To that extent, the remark was true, as the fact of resumption showed.
*48 Another circumstance that appears to have been treated at the trial as evidence of a fraudulent intent, is the fact that the firm of Clews and Zeidler secured a part of their debts by a pledge of collaterals. When the collaterals were turned out does not appear, and there is no pretense that the pledging of them was other than a fair and bona fide transaction between the firm and the secured creditors, the sole object of which was the protection of the latter. There was no secret or o-lier arrangement by which the collaterals were to be covered up and put out of the reach of the unsecured creditors for the benefit or advantage of the debtor. How does that transaction tend to show that Clews, in subsequently receiving the plaintiffs’ money, intended to cheat them ? Suppose that the firm, instead of securing a portion of their debts, had absolutely paid them. Would that act have been a badge of fraud? There is no evidence but that at the time when the collaterals were turned out the defendants supposed themselves solvent.
Another circumstance which was urged at the trial as evidence of fraud, is that the new firm loaned to the old firm $160,000, knowing that the old firm was insolvent. But the loan was not made solely on the responsibility of the borrower. It was secured by collaterals turned out by the borrower, of the nominal amount of over $1,000,000 and according to the only witness who spoke upon the subject, of the actual value of over $630,000.
If there is any other circumstance in the case .that, by any construction, can be regarded as evidence of fraud, I have failed to discover it. It is true the firm was insolvent—largely insolvent, as it afterwards turned out—at the time of receiving the plaintiff’s money, but as has been said, the mere fact of known insolvency, and the omission to disclose ft, do not per se constitute fraud. The proof of fraud, if it exists at *49 all, in the present case, must be found outside of those circumstances. If we are correct in our view of the transactions of the firm prior to the receipt of the money in question, they are not inconsistent with good faith on the part of the defendant. And if we look at what transpired at the time of, or subsequent to, the receipt of the money, the case is not only barren of evidence of fraud, but it furnishes very cogent proof of the strict integrity of the defendant. It appears that the plaintiffs had deposited with the first firm, prior to their suspension in September, 1873, certain bonds to the amount of $20,000, as a security against over-drafts, and those bonds had remained with the new firm for the like purpose. It also appears that immediately after the suspension of the new firm, they received from the plaintiffs, for collection, drafts and other paper, mailed before the suspension. Had the defendants been actuated by an intent to defraud the plaintiffs, nothing would have been more natural or more easy than to misappropriate the bonds and the avails of the paper thus sent to them for collection. Instead of doing so, the defendants at once placed the bonds and the avails of said collections, together with collections made for other customers to the amount of several thousand dollars, with a solvent bank in the city of New York to- the credit of their respective owners, including the plaintiffs, and the plaintiffs got what belonged to them. And it would seem that the plaintiffs themselves, at the time of the transaction, were strongly impressed with the honesty of the defendants, for they proved their debt in bankruptcy more than a year after the failure, without a suggestion of fraud, and they did not commence this action until more than three years after the defendants suspended. On the whole, instead of there being a balance of proof to support the verdict, we think this case is substantially destitute of evidence of fraud, and that the verdict can *50 only be regarded as the result of a biased or partial view of the evidence, by which, as it appears to us, great injustice has been done.
It does not follow from what we have said that the court erred in denying the defendant’s motion for a nonsuit (Kinsman v. New York Mutual Insurance Co., 5 Bosw. 460). We are not prepared to say that the case was barren of evidence, which, unexplained, would have justified inferences favorable to the plaintiffs’ case, the considering and weighing of which was within the province of the jury. But the conclusion of the jury is so manifestly against the preponderance of the evidence that we deem it our duty to set aside the verdict. That we have the power to review the evidence, and to set aside a verdict or report which is clearly against the weight of evidence, and that it is our duty to do so in a proper case, is undoubted (Smith v. Insurance Co., 49 N. Y. 211).
The plaintiffs seem, to have claimed at the trial that, in any event, they were entitled to recover the amount of two remittances made by them, which were received by the defendants on the day of tbeir suspension, amounting in all to the sum of $314. The claim depends upon whether those remittances were received before or after the suspension. The uncontroverted testimony was that the defendants’ firm suspended on October 2, 1874, between half-past eleven and a quarter to twelve ; that the remittances in question were received by the first mail of that day, and before ten o’clock ; and that according to the custom of the house, the funds arising from receipts by that mail, daily, were immediately deposited in the bank. And the defendant’s paying teller testified that he presumed, and had no reason to doubt, that that custom was observed with regard to the remittances in. question, and that to the best of his knowledge, all the moneys, received by the defendant’s firm after their suspension *51 were put in another bank. It was also shown by a written admission signed by the defendant’s attorney and put in evidence by the plaintiffs, that it appears by the check-book of Walter Carr & Co., of New York city, on whom one of said remittances was drawn, that on October 2, said firm paid by check, to the order of the defendants, the amount which said remittance called for ; that said check was the second check drawn by said firm of Walter Carr & Co. that day; and that the place of business of said Carr & Co. was generally open for the transaction of business, including the drawing of checks, by nine o’clock A.M. of each day. The only item of testimony qualifying the above, in any respect, was the further statement in said admission, that bank collectors usually called on said firm of Carr & Co. between eleven A. M. and three P. M., and that such custom was general but not invariable. This statement of all the evidence touching this particular question shows that if there is any controversy whatever on the point, the clear preponderance is on the side of the defendants.
We come now to the defendant’s exceptions. If the fraud found by the jury were supported by the evidence, the action would not be barred by the discharge in bankruptcy, as the defendant’s counsel supposes. The fraud imputed by the verdict, if it existed, would be an active, express fraud, involving moral turpitude and intentional wrong, in contradistinction to implied fraud or fraud in law, and the debt growing out of the transaction as found by the jury would be a debt “created by fraud,” within the meaning of section 5117 of the U. S. Rev. Stat., and so not discharged by the proceedings in bankruptcy (Bradner v. Strong, 39 N. Y. 299).
We have already intimated our views respecting the admissibility of the testimony of the witness, Green, above referred to. Probably, the exclusion1 of *52 ib could not have been justified, inasmuch as it was competent for the plaintiffs to show, if they could, that as far back as the time to which the testimony-related, the defendant Clews had conceived and continued to, entertain the alleged fraudulent design found by the jury; but, as we have seen, the clear weight of evidence is opposed to that theory.
The schedules filed in the bankruptcy proceedings, in which Clews and Zeidler were discharged individually and as members of their firm, were properly received in evidence, although signed and verified by Zeidler alone. Clews, by availing himself of those proceedings, and accepting his discharge thereunder, and pleading the same as a defense in this action, adopted the schedules, and was bound by their contents, to the same extent and with the same effect as if he had signed and verified them.
The bankruptcy schedules of the firm composed of Clews and Fowler were competent evidence against Clews, and were properly received upon the question of the solvency of the firm, which became material by the showing that Clews and Zeidler had loaned a large sum to that firm.
It was n,ot error to permit the plaintiffs to read in evidence the cross-examination of the witness Frost, although they had read his direct examination as their own evidence. The testimony elicited on his cross-examination had not the effect, as the defendant’s counsel suggests, to impeach or discredit the witness, but it simply tended to qualify or explain what he had stated on his direct examination.
We think, however, the trial judge fell into an error in refusing to allow the defendant’s counsel to read to the jury the amendments to the schedule of Clews and Fowler. The exclusion was put upon the ground that the amendments were made after this action was commenced, and the defendant Clews could not thus *53 make evidence in his own favor. But, as we read the case, the amendments were put in evidence by the plaintiffs, and the defendant merely asked permission to read that which was already before the court and jury, the contents of which had not been brought to their attention. This fact appears very distinctly from the case. Mr. Sessions, for the plaintiff, offered in evidence certified copies of the papers in the bankruptcy proceedings of Clews and Fowler, attached together, under one certificate, including their petition verified in March, 1879, praying that the schedules previously filed might be amended so that they should conform to the facts set forth in the petition, and an order of the register that they be so amended, and that the said petition and order be annexed to said schedule by way of such amendment. The said petition and order were filed in March, 1879, and the amended schedules were annexed to and formed a part of said petition. The defendant’s counsel objected to the reception of the papers so offered on several grounds specified by him, and the objection was overruled. The case proceeds to state that Mr. Sessions then produced the papers so offered and admitted, and said, “I read in evidence these papers in the case of Clews and Fowler and Clews and Zeidler.” Mr. Abbott: “What portions of them?” Mr. Sessions: “The whole of them.” Mr. Abbott: “Including the amendments?” Mr. Sessions: “The whole of them, I said.” Having thus introduced all the papers in the case, including the amendments, and read such of them as he desired, we think the defendant had the right to read the amendments. They were made material by the reception of the other papers in the case, and their exclusion was error.
For these reasons the judgment and order refusing a new trial are reversed, and a new trial is ordered, costs to abide event.