LEMUEL COFFIN *et al.*, Appellants, *v.* WILLIAM H. HOL-
LISTER, as Assignee, etc., Respondent.

*Supreme Court, Third Department, General Term, December 11, 1889.*

1. *Replevin. Fraud.*—To maintain replevin against a general assignee on
   the ground of fraud, there must have existed, at the time of the pur-
   chase, an intent not to pay for the goods; a condition of known in-
   solvency is not enough.
2. *Same.*—Such fraud must be proved and cannot be presumed.
3. *Same.*—False statements as to financial condition, made after the pur-
   chase, are immaterial.

Appeal from judgment in favor of defendant against
plaintiffs for $2,897.81 damages and $665.86 costs.

*R. H. Hall*, for appellants.

*Nelson Davenport*, for respondent.

LEARNED, P. J.—This is an action to recover from Hol-
lister, the general assignee of Toles & Pettit, certain goods
which the plaintiffs aver belong to them and which they aver
were fraudulently obtained from them by Toles & Pettit
about October 31, 1881, on a credit of sixty days and have
not been paid for.

When this case was previously before this court we held
that it was competent for plaintiffs to prove that in March,
1880, Toles & Pettit had made certain statements as to their
property to plaintiffs before the first sale of goods, and had
made confirmatory statements down to October 31, 1881,
and we granted a new trial for the exclusion of this evidence.

On the second trial the referee, before whom the case was
then tried, found that there were no facts which authorized

plaintiffs to rescind the sale or to retake the goods, and that at the time of the commencement of the action the said defendant was the actual owner of the goods.

The plaintiffs now appeal, and the principal, if not the only, ground of appeal is that the referee erred in his findings of fact.

We may refer to the opinion given when the cause was here before, as it contains an examination of much of the testimony then given, some of which seems to have been given also on the last trial. Coffin *et al. v.* Hollister, 31 Hun, 81.

As to the general principle governing this case we need only cite Morris *v.* Talcott, 96 N. Y. 107 ; Nichols *v.* Pinner, 18 Id. 295 ; People's Bank *v.* Bogart, 81 Id. 108 ; Macullar *v.* McKinley, 99 Id. 353. In brief there must have been an intent, when the property was purchased, not to pay for it ; and a condition of known insolvency is not enough. " The intention not to pay can no more be inferred from the mere fact of insolvency than the fact of insolvency can be inferred from the existence of an intention not to pay." Yet it should be remarked that there might be such a condition of utter and hopeless inability to pay as would justify the belief of a fraudulent intent.

The sale of goods in question, amounting to about $2,000, was made October 31, 1881. As to the condition of the firm soon after that time we have the testimony of their bookkeeper. In the statement of their condition he places among their liabilities over $12,000 owing to Toles, one of the partners. Now plainly this liability is not to be considered in examining their condition. Omitting this, the statement shows liabilities of little less than $43,000. The same statement shows assets over $48,000. The witness states that during the two years since the firm commenced business it had lost about $14,000. But in making this statement he includes the loss of capital and of money lent by the partner Toles. For it appears that Toles put in $600 and Pettit

$3,000. Toles had also put in, including rent not paid to him, about $12,000.

In the schedules attached to the assignment made January 3, 1882, it appears that the actual, not nominal, value of assets was about $40,000 ; the nominal, about $57,000. The liabilities, exclusive of the debt to Toles, were about $45,000.

From these schedules it also appears that Toles had property above encumbrances of the value of $30,000, liabilities about $19,000. Now it is true that this property was also mortgaged to secure liabilities of Toles & Pettit, and of Toles. But of course these mortgage liabilities are not to be added to the liabilities already stated. That is, we are not to deduct the mortgages first from the assets, and then to set up the total debts against the balance. We must take the total debts and the total assets in order to see what was the condition of the firm. We have deducted from Toles' real estate the taxes and those mortgages which were not collateral to debts of Toles & Pettit, or to debts of Toles, and that makes the value of the real estate $20,000.

The same witness made up a statement after the assignment by which he shows unpreferred creditors of Toles & Pettit about $24,000, and assets to pay them about $7,000 leaving deficiency $17,000. But it is evident that in these unpreferred liabilities is included the debt to Toles of over $10,000. Deducting this the unpreferred liabilities are about $17,000, and the deficiency about $7,000. And we have already seen that of Toles' property there was about $11,000 surplus applicable to these debts of Toles & Pettit. So much for the financial condition of the firm and the partners at the time of the purchase.

Mr. Toles died before the first trial.

Mr. Pettit testifies that he made the purchase with a view of paying for it, and not with any intent to avoid payment.

The plaintiffs charge an act in the nature of a crime, which must be proved, and cannot be presumed. Morris *v.* Talcott, *ut supra*.

The representations alleged to have been made by Toles & Pettit were made in March, 1880, when plaintiffs, through their salesman, solicited the custom of this firm. During the two years the firm bought some $7,000 of the plaintiffs, and, excepting the last bill, paid for the same. The plaintiffs also charge that the rating of the firm in a mercantile agency as it first appeared in December, 1879, and was continued through 1880 and 1881, was too high, and that they were deceived thereby. A letter of the firm to one of the firms of whom they bought in March, 1880, refers to the rating as from $40,000 to $75,000, and says that it is not too high. This came to the knowledge of plaintiffs. There is evidence, too, that Toles & Pettit were subscribers to this agency.

There is a conflict of evidence as to the alleged statements made by Pettit to the salesman. These alleged statements contained an assertion as to Toles that he was worth $75,000. There is no proof as to what Toles was then worth. It is, therefore, not shown that the statement was untrue; or that the rating was then too high.

It is shown that the firm did a very good if not large business; and it is probable that they did business at a loss. But it does not appear when that loss was enough to make the firm insolvent, if, indeed, including the assets of Toles, it became insolvent.

We do not think it would be profitable for us to detail the testimony in this case. We have examined it carefully. The question, as already stated, must be one of the intent of the firm at the time of the purchase. While we may review the report of the referee on questions of fact, we are strongly of the opinion, as we have repeatedly said, that generally the conclusion of an able and impartial referee who hears and sees the witnesses is better on questions of fact than that of an appellate court, which must only read the testimony. Even if we should think that we might have come to a different conclusion, we should still hesitate to reverse, on that ground, the referee's findings.

But in the present case we think the report is justified by the evidence. The alleged representations were made some eighteen months before the sale in question. It can hardly be assumed that these representations were made with intent to defraud. The firm went on and did business for nearly two years. Their sales during 1881 were about $80,000. They did an increasing business and were behind their orders. But it evidently appears that their expenses were too great, and thus they lost money.

We think, from an examination of the evidence, that, when they made the purchase in question, it is not proved that they did not intend to pay for the goods, or even that they knew themselves to be in such a condition that they could not pay for them. They were probably hopeful, and more hopeful than the event warranted. They are, however, to be judged by the condition as it then appeared to them.

The plaintiffs urge that Pettit in January, 1882, made a false statement of the condition of the firm to one Smith, manager of a mercantile agency. But this statement could have had no effect on the plaintiffs in their sale of October previous. The same witness testifies to a conversation in December, 1881, in which Pettit said their rating was correct. This, too, was after the sale in question, and thus was immaterial as to the plaintiffs. The rating originally given in the books of the agency was made, as testified, on the report of one Sims made December 5, 1879. It does not appear that Toles or Pettit made any statements to Sims or to the mercantile agency on which that rating was based. It may be argued that the firm knew of the rating, because they were subscribers to the agency and because of the letter of March 3, 1880, to Whiten & Collins. Now it is not shown that at that time the members of the firm were not worth the sum at which the firm was rated. Mr. Toles was evidently the man of capital in the firm. How much his property may have shrunk between March 3, 1880, and October 31, 1881, is not in evidence.

Without repeating the evidence any further, we need only say that we see no ground to reverse the report on the facts.

There are no questions as to the exclusion or admission of evidence which need be considered.

Judgment affirmed, with costs.

FISH and PUTNAM, JJ., concur.

NOTE ON "EFFECT OF KNOWN INSOLVENCY OF VENDEE ON SALE."

An intent to defraud cannot be imputed to a party who contracts a debt knowing that he is insolvent, merely from the fact of his insolvency, and his omission upon a purchase of property upon credit to disclose such condition to his vendor. Morris *v.* Talcott, 96 N. Y. 100. The intention not to pay can no more be inferred from the mere fact of insolvency, than the fact of insolvency can be inferred from the existence of an intention not to pay. Id.; Peoples' Bank *v.* Bogart, 81 N. Y. 101; Nichols *v.* Pinner, 18 Id. 295; 23 Id. 264. A purchaser is not bound, when no questions are put to him in regard to it to disclose his own pecuniary condition or means of payment. Id. If he makes no false statements and resorts to no acts or contrivances for the purpose of misleading the vendor, it is not a fraud to say nothing on the subject. Id.; Dambman *v.* Schulting, 75 N. Y. 55.

Where the buyer is insolvent and conceals the fact from the seller for the purpose of defrauding him and thus obtains the goods without intending to pay for them, the title of the property, *it seems*, is not changed and it may be reclaimed by the seller. Hotchkin *v.* Third Nat. Bank, 127 N. Y. 329. But mere insolvency, without the intent to defraud on the part of the buyer, is not sufficient. Id.

The plaintiffs, in an action to recover, from an assignee, goods fraudulently obtained, must show that there was an intent not to pay for the goods when purchased. Coffin *v.* Hollister, 54 Hun, 639. A condition of known insolvency is not enough. Id.

That the purchaser knows that he is insolvent at the time of the purchase, is not sufficient to avoid a sale. Bach *v.* Tuch, 57 Hun, 588. The insolvency must be of that extreme character that he must know that he will fail before the time for the payment of the goods arrives. Id.

A request to charge that, if at the time of the purchase the buyer knew he was so insolvent that he could not pay all his liabilities including the purchase in question, then without regard to previous statements made by him, the purchase was a fraud upon the seller, was held, in Cantor *v.* Claflin & Co., 58 Hun, 610, to have been properly refused.